Charles E. JOHNSON, Plaintiff–Appellant,

v.

Gary R. McCAUGHTRY, Warden, Waupun Correctional Institution, Defendant–Appellee.

No. 95–2275.

United States Court of Appeals, Seventh Circuit.

Argued March 28, 1996.

Decided Aug. 13, 1996.

Allen E. Shoenberger, Karen S. Lentz (argued), Loyola Univ. School of Law, Chicago, IL, for Charles E. Johnson.

Paul Lundsten (argued), Office of Atty. Gen., Wis. Dept. of Justice, Madison, WI, for Gary R. McCaughtry.

Before BAUER, ESCHBACH, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Johnson was convicted by a jury of armed robbery in Wisconsin state court. After exhausting his state appeals, Johnson filed a petition for a writ of habeas corpus in district court. Johnson maintains that the exclusion of persons under the age of 25 from his jury pool by a particular jury commissioner violated his Sixth Amendment right to a jury composed of a fair cross section of the community and his right to due process. He also argues that he was denied due process by certain out-of-court and in-court identifications by key state witnesses, which he asserts were impermissibly suggestive and unreliable. The district court denied his petition, and we affirm.[1]

**I.**

At approximately 1:30 p.m. on February 7, 1989, two black men robbed the Crossroads Pharmacy, located in a strip mall in Menominee Falls, Wisconsin. After pretending to be shopping while the pharmacist, Thomas Welke, finished dealing with a female customer, the men came around the pharmacist's counter. The shorter man pointed a handgun at Welke's face while the taller man began to take the store's supply of Dilaudid, a controlled narcotic used as a pain killer. Both men were wearing dark clothing that largely concealed their features. The shorter man, identified at trial as Charles Johnson, was wearing a dark stocking cap lowered to his eyebrows, a jacket with a hood drawn tight around his face, and a scarf covering the base of his nose and his mouth. Welke testified that the only area of the man's face that was visible was the area between his eyebrows and the mid-bridge of his nose. He also testified that he specifically noticed the color of the man's eyes, which he thought was atypical, the color of his skin, and the pocked texture of his skin. Welke observed the shorter man for 30 to 60 seconds. The man then told Welke that nothing would happen if he did as he was told and that he should squat down and not look at them. The shorter man held a gun to Welke's head as he squatted down, while the taller man finished taking all the Dilaudid from the store's inventory. Welke continued to observe the two men via his peripheral vision. The men then attempted to get into the cash register at the pharmacy counter, but left the store when they were unable to do so.

Welke observed the thieves leave through the front door and run around the Sears store, which was located at the end of the strip mall, heading toward the back of the mall. He then went to the back door of the pharmacy, where he observed a green van driving away with a bearded white man at the wheel. Welke called the police, and when they arrived he told them what had happened, as described above. Welke estimated the shorter man to be 5′ 6″ and the taller man to be 6′ 3″. According to a police report, Welke described the shorter man as in his late twenties or thirties. Johnson is between 5′ 9″ and 5′ 10″ tall and was 51 years old at the time.

---

1. Congress recently amended 28 U.S.C. § 2254, the habeas corpus statute under which Johnson seeks relief. Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214, enacted April 24, 1996. This new statute decreases the scope of federal habeas review. On June 17, 1996, this court heard oral argument, en banc, in *Lindh v. Murphy*, No. 95–3608, in order to determine whether the statute applies to cases that were pending at the time of its enactment. The result of this determination does not have practical effect for Johnson's case, however, since we conclude that his appeal would fail even under the old standard of review.

Michael Hyland, a mall maintenance worker who had been shoveling snow at the strip mall on February 7, 1989, also saw the thieves leave the store. Hyland was sitting in his truck eating lunch when he saw the two men dash out of the pharmacy and around to the back and then the pharmacist run to the front door and yell out after them. Sensing that something was wrong, Hyland started his truck and drove around to the back of the mall. He did not see the men when he reached the back, though he did observe an old van driven by a white man with a beard. Hyland also testified that before leaving to get his lunch, he had earlier observed the two black men that ran from the store. While Hyland was shoveling snow, he had noticed the two men walking back and forth in front of the stores in the mall and observed them from as close as 15 feet. He described the two men as 5' 9" and 6' 3"–6' 4" in height. Hyland stated that although the shorter man wore a scarf, it did not cover the bottom part of his face when he observed the man.

An employee of the Sears store had noticed the green van in the parking lot that morning and recorded the license plate number. The employee noticed the van because it was parked in an area behind Sears usually reserved for delivery trucks. The license plate number led the police to Charles Appleby, the owner and driver of the van. Appleby refused to talk to the police about the robbery unless he was given immunity from prosecution by the district attorney's office. Appleby was granted immunity after he promised to give information and to testify against the other two robbers. Appleby testified that the other two men were Charles Johnson (the shorter man) and Johnson's half-brother Mario Roth (the taller man).[2] Appleby testified that he was in the pharmacy a few days before the robbery to have a prescription for Dilaudid filled. This was corroborated by Welke's testimony about filling a single Dilaudid prescription just prior to the robbery. Appleby acknowledged that he was addicted to Dilaudid and that he noticed that the Dilaudid at the Crossroads

Pharmacy was readily accessible behind the pharmacist's counter, i.e., "easy to steal." Later Appleby talked to Roth about the possibility of stealing the Dilaudid, and on the evening of February 6 they surveyed the pharmacy, noting the absence of security cameras, and determined that the Dilaudid would indeed be easy to steal.

Appleby testified that on February 7, the day of the robbery, he learned from Roth that his brother "Chuck" would also participate. Appleby testified that he knew Charles Johnson prior to that time. The group met at a home in Menominee and proceeded to the. Crossroads Pharmacy, where they carried out the robbery. Appleby testified that they discussed how the robbery would be carried out on the way to the pharmacy and that Johnson participated in the discussion. The plan was that Appleby would be the getaway driver and the other two would pull off the theft. Appleby testified that after Johnson and Roth came running around to the van, he drove away, and they went off and divided the Dilaudid among the three of them. Appleby acknowledged that he was under the influence of Dilaudid at the time of the robbery. Appleby also testified that later in the day on February 7, he was involved in a car accident that landed him in the hospital. His initial conversations with the police about the robbery occurred during the four days he was in the hospital as a result of this accident and was heavily sedated.

After Appleby named Johnson and Roth as his accomplices, the police showed Welke, Hyland, and Appleby photo line-ups. The witnesses viewed the photo arrays on February 23, sixteen days after the robbery. In one photo line-up the witnesses were given seven pictures to view, including one of Johnson. Six of these pictures had a pastel, unmarked background and were identified as Menominee Falls police photographs. The other picture, the one of Johnson, had a different colored background and contained a height chart. According to this height chart, Johnson was between 5' 9" and 5' 10" tall.

2. Roth was convicted of armed robbery in a separate trial.

When Welke viewed the photo line-ups, he used his fingers to cover the area in each photo that he was unable to observe on the day of the robbery and focussed on the eyes and the cheekbone area. Welke identified the photograph of Johnson as the shorter man who had held the gun to his face. Welke testified that in identifying the shorter robber, he focussed upon the placement and color of his eyes, as well as the complexion of his skin. Appleby likewise picked out Johnson from the line-up, though Hyland was unable to do so. All three men identified Johnson as the shorter robber at trial.[3] In addition, Welke, Hyland, and the Sears employee all identified pictures of Appleby's green van as the one they had seen at the Crossroads Pharmacy the day of the robbery.

Johnson's main defense was that he had been misidentified, and the cross examinations of Welke and Hyland focussed on the reliability of their identifications. The cross examination of Appleby centered on his inability to remember various details from the day of the crime-such as the address where the men met, whether he picked up Johnson or not, what route he took to the pharmacy, etc.—and his possible motivation to frame Johnson due to an earlier deal or unpaid debt between the two.

## II.

Johnson's trial occurred on August 15–17, 1989, and he was convicted by the twelve-person jury of armed robbery. Because Johnson challenges the process by which his jury was impanelled, it is necessary to explain in some detail the manner in which juries are formed in Waukesha County, Wisconsin, at least at the time of Johnson's trial in 1989.[4] Prior to Johnson's trial there were three jury commissioners in Waukesha County, each of which represented a different

geographical section of the county. Each commissioner was given a county-wide listing of names supplied by the State Department of Transportation. The lists were alphabetized and contained the names of all county residents with driver's licenses. The lists provide each person's name, address, date of birth, and driver i.d. number. Each commissioner would then use these lists to produce shorter lists of potential jurors residing in their assigned geographic area. Whenever the county clerk requested potential juror names, the three commissioners would provide the clerk with names from their region.

Commissioner Dorothy Betker testified that when generating a list of names of persons from her district, she would simply skip around the master list picking names of people from her district. She did not target people in any manner, nor did she seek to exclude any group of persons. Although Commissioner Howard Mathison did not testify, Johnson does not allege that he discriminated in any way in generating the list of names of potential jurors from his district.

Commissioner Earl Rentmeester, however, admitted that his list of names was not generated at random. Rentmeester testified that when the county clerk requested names, he would take out a few of the alphabetized driver's license sheets that he had not used yet. Thus Rentmeester typically generated lists of persons whose last names began with only a few letters of the alphabet—in this case "G" and "H". He would then go through these sheets looking for persons living in his district. When he found one he would check the date of birth. Rentmeester testified, "I tried to keep them around forty years of age, not younger; but I do have people that I have put in that are twenty-five, twenty-seven, thirty-three, but no younger." Rentmeester testified that based on his personal experience as a juror on a panel

---

**3.** According to Johnson, Welke was allowed to observe both Johnson and his co-defendant, Mario Roth, in their jail jumpsuits and physical restraints at the preceding preliminary hearing.

**4.** In making his jury panel challenge, Johnson relies upon evidence compiled in a separate Waukesha County case, *State v. Roosevelt Clay*, No. 87–CF–0201. The parties agreed to incorporate this jury selection evidence into this record,

and it serves as the factual basis for Johnson's challenge. The trial court in Johnson's case found that the trial court in Clay's case had already denied Clay's motion to quash the panel (which was based on the alleged exclusion of youth as well as other claims), and it incorporated the Clay court's decision in denying Johnson's motion.

with persons who were 18 and 19 years old, he felt that young persons were not mature enough and did not have enough experience to be jurors. He acknowledged that he excluded all persons under the age of 25, unless he actually knew the person.[5]

The Waukesha County Deputy Clerk, Susan Van Able, testified that in this case a total of 2100 names were submitted by the three jury commissioners, 700 from each.[6] Juror Qualification Questionnaires were then sent out to these 2100 people. Persons who did not respond within three to four weeks were sent a second questionnaire. If there was still no response, Van Able would inform a county judge how many responses she had received and ask how to proceed. Sometimes a third questionnaire would be sent. In addition, if Van Able learned that a person had moved within the county, she would seek to obtain the person's new address and re-mail the questionnaire. Van Able testified that of the 2100 forms sent out, she would typically receive responses back from 1500 to 1600 persons. These questionnaires would then be reviewed to determine whether each person was qualified to serve as a juror. If a person had been summoned for jury duty within the preceding two years, was under the age of 18, had been convicted of a felony, was unable to read and understand English, or had a disability that would preclude serving, that person would be excluded. In this way the initial list of 2100 names was reduced to 1106 names, each of which was listed on a separate card and put into a drum.

The drum was then spun, in order to mix the names from the three jury commissioners, and handfuls of cards were pulled out. (The parties agree, however, that in this case the drum was not spun enough times to adequately mix up the cards.) As the cards were pulled out, a master list was compiled in the order the names were drawn. This process continued until all 1106 names were drawn and listed on the master list. Each sheet of the master list contained 54 names. Then when a judge requested names for a jury, the county clerk would give the judge the next group of sheets from the master list that was sufficient to meet the judge's request. For example, if a judge requested 100 names, the clerk would provide the next two sheets of 54 names. In Johnson's case the judge obtained a jury panel of 187 names (apparently from among 4 sheets from the master list), which was then reduced to the 38 persons who composed Johnson's venire.[7]

### III.

Johnson challenges both the process by which his jury was selected and the identifications of Welke, Hyland, and Appleby. We take up the jury challenge first. Johnson maintains that Commissioner Rentmeester's actions in excluding persons age 18–25 violated his Sixth Amendment right to a jury composed of a fair cross section of the community. In *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court established the framework for addressing such a challenge.

■ In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of this group in the jury-selection process.

■ *Id.* at 364, 99 S.Ct. at 668–69. Once the defendant establishes a prima facie violation, the state bears the burden of justifying the challenged infringement by demonstrating a significant state interest that is incom-

---

5. The trial court in the Clay case ordered the Waukesha County jury commissioners not to consider age when compiling names of potential jurors and to make lists using last names beginning with randomly chosen letters of the alphabet. There is no evidence in this record that Rentmeester's practices continued beyond 1989.

6. These lists of 700 names had been destroyed by the time of Clay's challenge and so were not available either to Clay or Johnson.

7. The record does not disclose exactly how this was done.

patible with attainment of a representative jury. *Id.* at 368, 99 S.Ct. at 670–71. If the state cannot do so, the defendant will have established a Sixth Amendment violation and is entitled to a new trial by a jury drawn from a fair cross section of the community.

█ Johnson argues that we should not apply the *Duren* test for a prima facie violation where, as in this case, a jury commissioner admits that he intentionally singled out a specific group in the community and systematically excluded those persons from the jury pool. Johnson relies on two First Circuit cases for this claim. *See Smith v. Cunningham,* 782 F.2d 292, 293 (1st Cir. 1986); *Barber v. Ponte,* 772 F.2d 982, 999–1000 (1st Cir.1985), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986). Specifically, Johnson hopes to rely on the following dicta from *Barber,* subsequently quoted in *Smith:*

> That is not to say, however, that if a classification were *specifically* and *systematically excluded* from jury duty the same standard would be used as here, where defendant simply relies on a statistical [sic] disparity in the venires to challenge its constitutionality. If certain people are specifically excluded from jury duty, then the jury-administrating authority would have created its own group. Clearly, the state has no right to deliberately exclude specific classes or groups from juries without some very special reason.

*Id.* (emphasis in original); 782 F.2d at 293 (quoting *Barber*). The court in *Smith* considered the possible relevance of the *Barber* dicta to *Smith's* jury challenge, but determined that *Smith* had not established that

the statistical disparity in his case was caused by intentional or systematic exclusion. *Id.* at 294. Thus since neither *Barber* nor *Smith* involved *intentional* systematic exclusion, even the First Circuit has never actually relied on the Barber dicta to forego the *Duren* test for addressing fair-cross-section claims.[8]

More importantly, the special "non-*Duren*" category postulated in *Barber* and *Smith* is inconsistent with *Duren* itself and caselaw in this circuit. *Duren* addressed a Missouri statute under which all women who did not want to serve on a jury were given an automatic exemption. Although 53 percent of the persons eligible for jury service in Missouri were women, the automatic opt-out provision resulted in venires averaging less than 15 percent women. 439 U.S. at 364–65, 99 S.Ct. at 668–69. The third prong of the *Duren* test requires that the exclusion be "systematic," and the Court noted that the exclusion in that case was systematic. *Id.* at 360, 364, 99 S.Ct. at 666, 668. The exclusion was also certainly "specific," since the exemption was only addressed to women. Thus the exclusion in *Duren* was both specific and systematic, and the Court nonetheless established and applied the prima facie test that Johnson seeks to avoid. Johnson responds that his case involved "deliberate egregious conduct by the jury administering authorities necessitat[ing] intervention" (quoting *Smith,* 782 F.2d at 293). We do not understand the parameters of this "deliberate egregious conduct" rule that Johnson postulates—and he does not offer any—nor do we believe that such a special category is consistent with *Duren* and its progeny, including our own decisions.[9]

---

**8.** Johnson's attempt to rely on *Barber* and *Smith* is somewhat ironic, since both were cases in which the First Circuit rejected the petitioner's claim that the exclusion of young persons age 18 to 34 violated the Sixth Amendment. *Barber,* 772 F.2d at 998 ("In the present case there is simply no evidence in the record for determining that people between the ages of 18 and 34 (as opposed to some other ages) belong to a particular group."); *Smith,* 782 F.2d at 293 ("[The petitioner] has failed to present any evidence relevant to establishing 'young adults' as a distinct class...."). In fact, *Barber* overruled prior First Circuit decisions recognizing "young adults" as a cognizable group for jury selection purposes. 772 F.2d at 998 (overruling *United*

States v. Butera, 420 F.2d 564 (1st Cir.1970) and *LaRoche v. Perrin,* 718 F.2d 500 (1st Cir.1983)). In doing so the First Circuit relinquished its distinction as the only circuit to have recognized young adults as a distinctive group for fair-cross-section purposes.

**9.** It is not even clear why the conduct of Commissioner Rentmeester was any more deliberate and egregious than the conduct in many other fair-cross-section cases. While Rentmeester's conduct may have been misguided, it does not appear to have been malicious. The *Duren* test is well-equipped to deal with cases, such as this one, where a particular group of people is ex-

In *Silagy v. Peters,* 905 F.2d 986 (7th Cir.1990), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), we addressed a situation where the official responsible for compiling the jury venire had exempted all persons age 70 or older from jury service, in violation of Illinois law. Thus the situation in *Silagy* would arguably be as "deliberate and egregious" as the situation in Johnson's case. Nevertheless, we applied the *Duren* test to determine if the petitioner had established a prima facie violation of the fair-cross-section requirement. *Id.* at 1010–11. Consequently, we find that Johnson's fair-cross-section claim should be evaluated under the *Duren* test.

The first question we must ask under *Duren* is whether the excluded group is a "distinctive group" in the community. We noted in *Silagy* that the term "distinctive group" is "a rather amorphous concept ... that the Supreme Court has not burdened ... with a precise definition." *Id.* at 1010. We found, however, that the concept must necessarily be linked to the purposes of the Sixth Amendment's fair-cross-section requirement, which the Supreme Court elaborated in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). In *Silagy* we summarized these purposes as:

> (1) to ensure that the commonsense judgment of the community will act as a hedge against the overzealous or mistaken prosecutor;
>
> (2) to preserve public confidence in the criminal justice system by ensuring that the community participates in the administration of our criminal laws; and
>
> (3) to further the belief that sharing in the administration of justice is a phase of civic responsibility.

cluded due to a belief that members of that group would not be able jurors.

**10.** Johnson argues that while the state may put age restrictions on juror qualification, it is unconstitutional for a single jury commissioner to do so on his own. While this argument is plausible, we have already rejected it. In *Silagy v. Peters,* we stated as follows:

> Although the exclusion before the court today is somewhat unique in that it was an individual

905 F.2d at 1010 (citing *Taylor,* 419 U.S. at 530–31, 95 S.Ct. at 698). The *Taylor* Court also mentioned the idea of a representative jury assuring "a diffused impartiality." 419 U.S. at 530, 95 S.Ct. at 698 (internal citation omitted). Although a representative jury may be made up of individuals with various biases, collectively the individuals will compose an impartial whole-at least that is the hope of the fair-cross-section ideal.

■ In *Silagy* we specifically considered whether persons of a certain age group—in that case, age 70 and older—could constitute a distinctive group under *Duren.* We concluded that " 'age' has already been rejected by this circuit as a characteristic which can define a group for purposes of the fair-cross-section requirement." 905 F.2d at 1010 (citing *Davis v. Greer,* 675 F.2d 141, 146 (7th Cir.), *cert. denied,* 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982)). In *Davis* we considered the exclusion of young persons under age 21 from the petitioner's jury venire and held that "[y]oung people between the ages of 18 and 21 ... are not a cognizable group or class." 675 F.2d at 146. We noted that the Supreme Court has made clear that states may put specific age requirements on the selection of jurors without violating the Fifth and Sixth Amendments.[10] *Id.* (citing *Carter v. Jury Commission,* 396 U.S. 320, 332, 90 S.Ct. 518, 524–25, 24 L.Ed.2d 549 (1970)).

■ Thus Johnson must fight an uphill battle in making the claim that persons age 18–25 are a distinctive group in the community. His counsel makes noble attempts to do so, but we simply are not convinced that the exclusion of these young persons will disable juries from reflecting the commonsense judgment of the community, result in a loss of public confidence in the system, or diminish the concept of jury service as a phase of civic

> state official, and not a statutory provision, that was responsible for the exclusion, this distinction is not one that is of constitutional significance. If the exclusion of a certain age group does not violate sixth amendment concerns when it is encompassed in a statutory provision, we decline to find a constitutional violation when the exclusion is simply the result of an individual state actor.

905 F.2d at 1011.

responsibility. Ultimately, the main downfall for such age-based claims seems to be an inability to establish that the perceptions and views of the excluded group will not be adequately represented by other included groups. Just as we found in *Silagy* that the petitioner had "failed to demonstrate that [the perspective of persons age 70 and older] will not be adequately represented by those aged sixty and over," 905 F.2d at 1011, Johnson has failed to establish that the perspective of persons age 18–25 will not be adequately represented by persons age 25–30, for example. While we appreciate counsel's creativity in this regard,[11] Johnson simply has not established that age 25 typically corresponds with any remarkable change of life perspective such that excluding persons below this age will result in a jury that is not representative of the community. We are not convinced that a jury's ability to be impartial, which is "the ultimate concern of the fair-cross-section requirement," will be reduced by the exclusion of these young persons. *Id.* (citing *Taylor*, 419 U.S. at 530, 95 S.Ct. at 697–98).

We are in good company in rejecting Johnson's claim that young persons constitute a distinctive group under *Duren*. Such age-based claims have been frequently made, but have been rejected in every circuit that has considered them. *See, e.g., Barber v. Ponte*, 772 F.2d 982, 998 (1st Cir.1985) (rejecting 18–34 years as distinctive group); *Brown v. Harris*, 666 F.2d 782, 783–84 (2d Cir.1981) (rejecting 18–28 years as distinctive group),

*cert. denied,* 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982); *United States v. DiTommaso*, 405 F.2d 385, 391 (4th Cir.1968) (rejecting 21–29 years as distinctive group), *cert. denied,* 394 U.S. 934, 89 S.Ct. 1209, 1210, 22 L.Ed.2d 465 (1969); *United States v. Kuhn*, 441 F.2d 179, 181 (5th Cir.1971) (rejecting 21–23 years as distinctive group); *Ford v. Seabold,* 841 F.2d 677, 681–82 (6th Cir.) (rejecting 18–29 years as distinctive group), *cert. denied,* 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 334 (1988); *United States v. Olson,* 473 F.2d 686, 688 (8th Cir.) (rejecting 18–20 years as distinctive group), *cert. denied,* 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973); *United States v. Potter,* 552 F.2d 901, 905 (9th Cir.1977) (rejecting 18–34 years as distinctive group); *United States v. Test,* 550 F.2d 577, 590–93 (10th Cir.1976) (rejecting 21–39 years as distinctive group); *Wysinger v. Davis,* 886 F.2d 295, 296 (11th Cir.1989) (rejecting 18–25 years as distinctive group); *United States v. Diggs,* 522 F.2d 1310, 1317 (D.C.Cir.1975) (rejecting 21–30 years as distinctive group), *cert. denied,* 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976).

■ Even if Johnson could establish that persons age 18–25 constitute a distinctive group for fair-cross-section purposes, his Sixth Amendment challenge would fail to establish that the unreasonable representation of such persons on his jury venire was due to systematic exclusion of the group from the jury selection process under *Duren*. Relying on the statistics accumulated by Johnson, the state concedes that only 5 per-

---

**11.** Johnson's counsel notes that car rental companies and insurance companies often discriminate against persons under the age of 25, that age 25 sometimes has ramifications for health insurance coverage, and that there are certain federal tax consequences of age 25. Counsel also postulates that persons at age 25 will reflect upon the fact that they have lived for one quarter of a century. We do not believe that "events" such as these actually result in a substantially different life perspective in persons over age 25. At oral argument Johnson's counsel emphasized the importance of the college experience in changing and shaping one's perspective. This argument is interesting, but it seems to undermine the concept of 18–25 year olds as a "group," since the pre-college, college, and post-college perspectives of persons may be so different—not to mention all the persons who do not attend or do not complete college. "Cohesive-

ness" has been recognized by various courts as significant to defining a distinctive group. *See, e.g., United States v. Potter*, 552 F.2d 901, 904 (9th Cir.1977) ("The group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience . . . .") (quoting *United States v. Guzman*, 337 F.Supp. 140, 143–44 (S.D.N.Y.), aff'd, 468 F.2d 1245 (2d Cir.1972), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973)). Counsel's other general arguments about "young persons" and "young adults" are either unsupported by evidence or overly broad, as age 25 is hardly an accepted boundary for "young adults." If anything, it would seem that age 21 marks a much more substantial turning point in the lives of most American young adults, yet we have already rejected this cutoff as well. *See Davis*, 675 F.2d 141.

cent of the people in the 187–person jury panel from which Johnson's venire was formed were age 18–29 years, while 27 percent of the jury-qualified general population in the state (age 18 and over) was in this age group.[12] The state acknowledges that the difference between 27 percent and 5 percent is quite substantial, but denies that the entire disparity can be attributed to "systematic exclusion" via the actions of Commissioner Rentmeester. The state notes that if Rentmeester excluded all persons in this group (0 percent representation)[13] and the other two commissioners produced representative panels (27 percent representation), the resultant list of 2100 names (700 from each) should have been composed of 18 percent persons age 18–29.[14] Thus the direct effect of Rentmeester's actions (the only alleged systematic exclusion) likely resulted in a decrease in representation from 27 percent to 18 percent, for an actual disparity of 9 percent and a comparative disparity of 33 percent.[15] In *United States v. McAnderson*, 914 F.2d 934, 941 (7th Cir.1990), we held that the difference between 12 percent blacks on the jury venire and 20 percent blacks in the community, for an actual disparity of 8 percent and a comparative dis-

parity of 40 percent, was not large enough to amount to unfair or unreasonable representation under *Duren*. Thus the expected effect of Rentmeester's action also would not qualify under *Duren*.

. Johnson responds that we must look at the actual numbers: the decrease from 27 percent in the general population to 5 percent in his 187–person venire. The problem with this approach is that we cannot reasonably attribute this much more substantial disparity to Rentmeester's activity, and Johnson does not allege any other discriminatory actions on the part of the state that could account for the total disparity. The state suggests two possible causes for the higher-than-expected actual disparity in persons age 18–29: 1) persons in this age group may have been less likely to return their qualification questionnaires, and 2) inadequate turning of the drum of juror cards and grabbing the names in handfuls resulted in a panel disproportionately composed of persons from Rentmeester's district. The first possibility is plausible and finds some support in the record,[16] and the second possibility is confirmed by Johnson's own evidence and allegations.[17] It appears from Johnson's charts

12. Although Johnson's challenge is based on the exclusion of persons age 25 and younger, the statistics he relies upon are for the 18–29 age group, apparently to facilitate comparison with available census statistics.

13. In fact, Rentmeester did include a few persons from this age group—presumably persons over age 25 or persons he knew.

14. Recall that, unfortunately, the actual list of 2100 names is no longer available; thus we do not know the true breakdown of ages within this group.

15. Actual disparity is determined by subtracting the percentage of the excluded group in the challenged panel from the percentage of that group in the general population: 27 percent – 18 percent = 9 percent. Comparative disparity (which represents the decrease in a specific group's representation relative to the size of that group) is determined by dividing the actual disparity percentage by the percentage of the excluded group in the entire community (and multiplying by 100 to obtain a percentage result): (9/27)100 = 33 percent (approximately).

16. While there is no direct evidence that young persons returned their juror questionnaires at a lower rate, the record contains some circumstan-

tial evidence in this regard. The record reveals that of the 1106 names put into the drum (from which Johnson's 187–person panel was determined), approximately 41.7 percent came from Rentmeester's district, while only 32.1 percent and 25.9 percent came from Betker and Mathison's districts, respectively. The initial 2100 names (700 from each) decreased to 1106 names when persons did not return their questionnaires or were disqualified for other reasons. These percentages provide some support, though they are not conclusive, for the state's theory that young persons (who were under-represented on Rentmeester's list) were less likely to return their cards than middle-aged and older persons (who were over-represented on Rentmeester's list).

17. In a petition for review to the Wisconsin Supreme Court, Johnson stated as follows:

The uncontroverted testimony of the commissioners and deputy clerk is that the names were drawn from the drum in handfuls; not one at a time, but handfuls, and the handfuls were drawn from the same area of the drum and the drum was not rotated adequately to mix up the cards. The result of this non-randomization process is that the jury is heavily weighed toward one of the commissioners . . . .

(and Johnson's counsel acknowledged at oral argument) that 119 of the 187 persons on his jury panel came from Rentmeester's district, giving Rentmeester a 64 percent impact, rather than the 33 percent that would be expected.[18] Thus the improper and non-random manner in which names were drawn from the drum largely accounts for the fact that Johnson's panel had substantially fewer persons in the age 18–29 age group than would be expected, even with Rentmeester's actions. Because even Johnson does not claim this faulty process can be termed "systematic exclusion," however, the decrease in representativeness caused by this process cannot be counted for *Duren* purposes. Thus Johnson has failed to establish that the unreasonable representation of young persons in his panel (even if they were a distinctive class) was due to systematic exclusion.[19]

### IV.

■ Johnson also challenges the out-of-court and in-court identifications by Welke, Hyland, and Appleby. In order to determine whether a defendant's due process rights were violated by a particular identification procedure, we apply a two-part inquiry. First, the defendant must establish that the identification procedure was unreasonably suggestive. *United States v. Funches*, 84 F.3d 249, 253 (7th Cir.1996); *see also United States v. Larkin*, 978 F.2d 964, 970 (7th Cir.1992), *cert. denied*, 507 U.S. 935, 113 S.Ct. 1323, 122 L.Ed.2d 709, and, 510 U.S.

913, 114 S.Ct. 301, 126 L.Ed.2d 249 (1993). Second, if the defendant establishes that the procedure was unduly suggestive, we determine whether the identification, viewed under the totality of the circumstances, is nonetheless reliable. *Funches*, 84 F.3d at 253; *United States v. Donaldson*, 978 F.2d 381, 385 (7th Cir.1992). As the Supreme Court has recognized, "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972) (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)).

Johnson maintains that the height bars on his picture in the photo array rendered the array impermissibly suggestive.[20] Johnson argues that because the appearance of the robbers was so obscured by their clothing and because the descriptions given by Welke and Hyland were both so limited, height became especially important as an identifying factor. The Wisconsin Court of Appeals agreed: "The picture with height bars was not only unique, but unique in a manner directly related to an important identification factor.... We are compelled to conclude that the photo array was impermissibly suggestive." The court found, however, that the identifications by Welke and Appleby were nonetheless reliable. Because of the circumstances of this case, we are somewhat doubtful that the array was actually impermissibly

---

18. With a 64 percent impact, if Rentmeester contributed no names in the 18–29 age group, and the two other commissioners contributed 27 percent, the expected result would be a jury panel with 9.7 percent persons age 18–29. Thus the process by which the names were drawn—which Johnson complains about but does not allege to be systematic exclusion—likely had nearly as great an impact (18 percent − 9.7 percent = 8.3 percent) in reducing these persons on Johnson's panel as the expected effect of Rentmeester's actions (27 percent − 18 percent = 9 percent). We do not find, and Johnson does not allege, that the difference between 9.7 percent (the expected number of persons age 18–29 in Johnson's panel after the non-random drawing process) and 5 percent (the actual number of persons age 18–29 on Johnson's panel) is due to some other form of undefined systematic exclusion.

19. While Johnson also purports to make a due process challenge to the representation of young

persons on his jury, he provides no argument, explanation, or law clarifying how the due process approach differs from the Sixth Amendment approach, which is his focus. In particular, Johnson has provided no response to the state's argument that since *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), held that the Sixth Amendment's right to jury trial applies to the states, there is no need for a separate due process analysis for claims like Johnson's. Because Johnson has failed to develop his due process argument or respond to the state's argument, we deem the argument waived and address it no further.

20. Johnson does not claim, however, that the different colored background of his photo or the fact that the others were designated as Menominee Falls police photos made the array impermissibly suggestive.

suggestive. Welke had reported that the shorter robber was 5′ 6″, but the height bars in Johnson's picture indicated that he was between 5′ 9″ and 5′ 10″. This difference is substantial and undermines Johnson's claim that the array was unduly suggestive with respect to Welke. Hyland, on the other hand, had indicated that the shorter robber was 5′ 9″, but he was unable to pick Johnson out of the photo array. And Appleby was previously acquainted with Johnson; in fact he provided the police with Johnson's name, which led to Johnson's picture being in the array. Thus it is difficult to conclude that the height bars had any suggestive effect for Appleby. Appleby was quite familiar with Johnson's appearance outside of the context of the robbery.

■ We need not actually decide the issue of improper suggestiveness, however, since we are convinced that the photo identifications of Welke and Appleby were otherwise reliable. The Supreme Court has established five factors to consider in making the determination whether an identification is reliable: 1) the opportunity of the witness to view the criminal at the time of the crime, 2) the witness' degree of attention at the time, 3) the accuracy of the witness' prior description of the criminal, 4) the level of certainty demonstrated by the witness at the identification, and 5) the length of time between the crime and the identification. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Neil*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ Even though Welke did not get to see much of the shorter robber's face, we are convinced that the circumstances of his selection of Johnson's photo from the array made the identification reliable. While Welke saw only a portion of the robber's face and only viewed him directly for 30 to 60 seconds, the robber was standing right in front of him during this time, allowing Welke to concentrate on the features that were visible. And it appears from his testimony that Welke did concentrate on the robber's features. The immediacy of the crime and the gun in his face apparently caused Welke to intensely fix his attention on the man holding the gun. Although Welke estimated this robber to be shorter and younger than Johnson, these inaccuracies alone are not enough to make Welke's identification unreliable.[21] Welke focussed upon the facial features that he could see, and he made his identification based on these features.[22] The other courts that have addressed this issue were impressed by the care with which Welke made his identification—covering the photos so only the portion he observed on the robber was visible—and the certainty with which he made his selection. We are too. Finally, Johnson concedes that the sixteen-day time lapse between the crime and the identification did not make the identification less reliable. Thus we conclude that Welke's identification of Johnson from the photo array and his subsequent identification of Johnson in court were reliable and properly before the jury.[23]

Skipping to Appleby, we note again that it was Appleby who led the police to Johnson in the first place. While Appleby's testimony may have been subject to other challenges (a grudge against Johnson, the opportunity to avoid liability for his own involvement, etc.)— and Johnson's counsel vigorously pursued these possibilities at trial—Appleby's ability to identify Johnson cannot be seriously questioned. He had plenty of opportunities to view Johnson, including during the planning

21. The age discrepancy seems especially insignificant given the limited facial area that Welke observed.

22. The jury heard Welke's testimony that he identified Johnson's photo primarily because of the appearance of his eyes. The jury was allowed to see the photo by which Welke identified Johnson and to observe Johnson's appearance in court. Thus the jury was well-equipped to evaluate Welke's claim that he could pick Johnson out because of his eyes and the area around his eyes.

23. Johnson argues, without relevant legal support, that Welke's "improper" viewing of Johnson at the preliminary hearing amounted to a "show-up" and further tainted Welke's identification of Johnson at trial. This viewing could not possibly have affected Welke's earlier selection of Johnson's picture, however, and it is ridiculous to suggest that the incidental, intervening viewing of Johnson in jail attire at the preliminary hearing should have precluded Welke's testimony and identification of Johnson at trial.

of the crime and splitting up of the proceeds. Johnson's gripe with Appleby is not the possibility of misidentification, i.e., making a mistake in recognition, it is the allegation that Appleby was purposefully accusing him falsely for some other reason. This theory was adequately conveyed to the jury, and we conclude that Appleby's photo array and in-court identifications were highly reliable in terms of not being mistaken. We do not believe that the various gaps in Appleby's testimony reflected any inability to accurately recognize Johnson's appearance.

 Hyland was unable to identify Johnson's photograph, but he picked him out in court, where Johnson was apparently sitting next to his attorney at the defense table. Obviously such identifications appear much less reliable than fair line-ups and photo arrays. This does not necessarily mean, however, that a witness should not be allowed to take the stand and make such an identification. The fundamental question is whether a witness' identification testimony is so unreliable that it violates due process to allow the jury to hear it. *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1156 (7th Cir.1987). Hyland's in-court identification does not meet this high standard. Johnson had more than adequate opportunity to cross examine Hyland and to make clear to the jury that Hyland was unable to pick Johnson out of the photo array. *See Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968) (noting importance of cross examination for substantially decreasing possibility of convictions based on misidentifications). Hyland's in-court identification may not have been especially convincing, due to the conditions under which it was made, but this does not mean it should have been disallowed. As we have noted previously in this context, "It is, of course, not our function in this setting to judge the ultimate accuracy of the identifications; that decision was made by the jury in its role as finder of the facts." *Kosik*, 814 F.2d at 1156; *see also United States v. Bolton*, 977 F.2d 1196, 1201 (7th Cir.1992) ("Generally speaking, the jury can intelligently weigh the reliability of a questionable identification."). In addition, Hyland's other testimony was admissible even if the identification was not.

In light of all the evidence in the case, particularly the testimony of Welke and Appleby, any error in allowing Hyland's in-court identification would have been harmless anyway. *Tague v. Richards*, 3 F.3d 1133, 1139–40 (7th Cir.1993).

We conclude by noting that Johnson's tacked-on ineffective assistance of appellate counsel claim is without merit. According to Johnson, "[h]ad he received effective assistance of counsel, his viable issues of jury discrimination and photo identification could have been addressed in the state courts where the standard of review is different from that of the habeas corpus standard." Two major problems: 1) the Wisconsin courts did address (and reject) these claims; and 2) neither claim is meritorious, whatever the standard of review. Thus Johnson has failed to establish "prejudice" under *Strickland v. Washington*, 466 U.S. 668, 691–92, 104 S.Ct. 2052, 2066–67, 80 L.Ed.2d 674 (1984); and his ineffective assistance claim falls in turn.

For the foregoing reasons, the district court's denial of Johnson's habeas corpus petition is AFFIRMED.