**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Joseph ALANIS, Defendant–Appellant.**

**No. 96–1752.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1997.

Decided March 31, 1997.

1240

Barry Rand Elden, Chief of Appeals, Kathleen T. Murdock (argued), Office of the U.S. Atty., Criminal Appellate Div., Chicago, IL, for Plaintiff–Appellee.

Allan A. Ackerman (argued), Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and FLAUM and EVANS, Circuit Judges.

FLAUM, Circuit Judge.

Joseph Alanis raises two issues on this appeal of his conviction for conspiracy to possess and possession of marijuana. He argues that he was entitled to a judgment of acquittal following trial. He also argues that comments made by the district court in the course of trial mandate reversal of his conviction. We affirm.

## I.

In July 1993, three brothers, Joe, Fidel and Julian Torres, agreed to transport almost 1000 pounds of marijuana from Brownsville, Texas to Chicago on behalf of Felipe Benavides.[1] Since 1991, Joe and Julian Torres had supplemented the wages they earned as truck drivers by making similar deliveries and by arranging for other truckers to do the same. The government got wind of their side venture, however, and in 1992 the Torres brothers started cooperating with the United States Customs Service. So when Benavides's representative approached Joe

---

**1.** In testimony at Alanis's trial, Fidel Torres referred to his brother as "Jose" Torres. Both parties' briefs adopt the anglicized version of the name, and we have followed their lead.

Torres about the Chicago delivery, Torres contacted the Customs Service, which told him to play along. Torres accepted the marijuana in Brownsville and, at a meeting with Benavides, was given two telephone numbers to call upon his arrival in Chicago. Although Torres did not know it at the time, the telephone numbers (one for a beeper, the other for a cellular phone) were registered to the Alanis Concrete Construction Company, the sole owner of which was Joseph Alanis.

The Customs Service took possession of the marijuana in Brownsville and flew it to Kankakee, Illinois, where it was unloaded onto a truck that Fidel and Julian Torres had driven north from Texas. At the Kankakee Airport, Customs Agent Ernesto Espinolda, who would pose as a third driver, joined Julian and Fidel in their truck. The threesome proceeded to a truck stop, where Julian called the beeper number after unsuccessfully trying the first telephone number. The return call, which came a minute later, directed the three to the Hillside Holiday Inn, where they were met by Benavides driving a white Jeep Cherokee. After Benavides picked up two passengers at the Holiday Inn, the truck followed the Jeep to a commercial car lot in Melrose Park. At the back of the car lot was a blue van, and Fidel was told to align the rear of his truck with the rear of the van. The van, we now know, was registered to Hardrock Construction (the predecessor to Alanis Concrete Construction), and the registration signed by Joseph Alanis. The back portion of the car lot was leased from the owner to none other than Joseph Alanis.

The transfer from truck to van commenced. It was just after eight on a mid-July evening, and there was still daylight. For three to five minutes, Espinolda stood between the vehicles facing the man he would later identify as Joseph Alanis. Fidel Torres handed marijuana bales from the back of the truck to Espinolda and Alanis, and they in turn passed the bales to others loading the van. Less industrious, Julian Torres abandoned the unloading to chat with Benavides, who stood to the side, hobbled by a wooden leg.

Because the Customs Service hoped to follow the marijuana to its ultimate recipient, no arrests were made at the car lot. Within twenty-four hours, however, agents arrested three individuals involved in the conspiracy, Oscar Garza, Benavides and Noe Alanis, Joseph Alanis's uncle. Benavides and Noe Alanis were staying at the Hillside Holiday Inn in a room registered to a company identified on the bill as "Rock." Found on Benavides at the time of his arrest was a business card with the name "Jose" written on it, as well as the same two telephone numbers provided Torres. Subsequent investigation uncovered the links between Joseph Alanis's construction company, the telephone numbers, the car lot, the blue van, and the white Jeep Cherokee, which was owned by Alanis's mother and registered to the company. Telephone billing records also implicated Alanis. In September 1993, Espinolda and Julian and Fidel Torres separately viewed a photo spread in which Joseph Alanis was one of six individuals pictured. Each identified Alanis as having been present at the car lot in Melrose Park.

In November 1993, Alanis was charged in a superseding indictment with one count of conspiracy to possess with intent to distribute marijuana and one count of possession of marijuana with intent to distribute. At trial, both Espinolda and Fidel Torres identified Joseph Alanis as a participant in the marijuana transfer, but Julian Torres proved unable to confirm his earlier identification. The jury convicted Alanis on both counts in June 1994; for some reason, he was not sentenced until March 1996. He now appeals, arguing that the district court erred in denying his motion for judgment of acquittal and that his defense at trial was prejudiced by certain of the district court's remarks. We discuss these contentions in turn.

## II.

Although Alanis styles his first issue as an appeal from the district court's denial of his motion for judgment of acquittal, see Fed. R.Crim.P. 29, his specific complaint concerns Espinolda's and Fidel Torres's in-court identifications. Those identifications, he maintains, were the fruit of a "flawed suggestive

photo spread," and their admission therefore violated his right to due process. Without the identifications, the argument appears to be, the evidence was insufficient to support a conviction. Because Alanis did not object at trial to the identifications, we review only for plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Wing,* 104 F.3d 986, 989 (7th Cir.1997) (citing *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993)).

■ Ordinarily when a defendant objects to an identification procedure, we evaluate the procedure in question using a two-step inquiry. *See Johnson v. McCaughtry,* 92 F.3d 585, 595 (7th Cir.1996). The first question is whether the identification procedure was unreasonably suggestive. *Id.* Assuming the answer is yes, the second question is "whether the identification, viewed under the totality of the circumstances, is nonetheless reliable." *Id.* Throughout, the ultimate aim is to avoid, in the oft-quoted phrase, "a very substantial likelihood of irreparable misidentification." *Id.* (citing *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972)) (internal quotations omitted).

■ Alanis cannot get over the first hurdle; indeed, he scarcely attempts to do so. His sole effort to demonstrate the suggestiveness of the photo spread is to assert that it was "somewhat unusual," ostensibly because "three of the six [individuals portrayed] had blanked or blacked out markings on their photographs." Our own examination of the photo array, however, does not bear out this assertion. The only "blacked out" portion of the array is the heading at the top of the page, which, prior to being obscured, read "Brownsville Police Department." All six of the men pictured in the photo spread, including Alanis, are Hispanic. With one exception (Alanis's father, the government informs us), all of the men pictured appear to be about the same age as Alanis. In short, there is nothing in the photo spread to single out Joseph Alanis. Yet the existence of a suggestive photo array is the key to our appellate review in this case, for, in the absence of an improper out-of-court identification procedure, Alanis's objection to the in-court identifications amounts to little more than a request that this court assume the role of the jury. We are not inclined to indulge this role confusion.

### III.

Alanis also argues that the district court's "overall conduct" denied him a fair trial. The court, Alanis asserts, fostered a "hurry-up" atmosphere and compounded matters by interjecting its own remarks during the examination of witnesses. Because these remarks, which we relate below, were not objected to at trial, we review them for plain error only.[2]

■ Specifically, Alanis complains of three instances in which the court either questioned a witness or offered its own observations. The first instance occurred during the direct examination of Fidel Torres. In a scene that is repeated in criminal trial after criminal trial, Torres picked out Alanis from the courtroom audience, and the government asked that "the record reflect that the witness ... has identified the defendant Joe Alanis as one of the individuals he saw at the lot." The following exchange took place:

THE COURT: All right, you are sure that that's the same person?

THE WITNESS: Yes, sir.

THE COURT: All right.

Questioning resumed. During cross-examination, defense counsel elicited from Fidel Torres the fact that the Customs Service paid him far more generously than did his private employer, the suggestion being that the Customs Service compensated Torres for cooperating as a witness as well as for playing the role of courier. Pursuing this line of questioning, counsel asked, "Is it any harder to drive a load of marijuana ... than a load of TV sets?" When Torres began to explain that controlled marijuana deliveries involved a greater degree of danger—that "your life"

---

**2.** Rule 614(c) of the Federal Rules of Evidence permits a party to object to the court's interrogation of a witness "at the time or at the next available opportunity when the jury is not present." *See United States v. Evans,* 994 F.2d 317, 322–23 (7th Cir.1993). Alanis's counsel did not object either "at the time" of the court's comments or "at the next available opportunity."

might be put in jeopardy—the court intervened, offering the observation that "you are dealing with some pretty tough characters."

The last of the district court's comments to which Alanis directs our attention came during the redirect examination of a government witness, Agent Eiden. Defense counsel, on cross-examination, had underscored the point that the majority of documents in evidence naming Alanis referred to him as "Joe" rather than "Jose"—the name that had appeared on the business card seized from Benavides. On redirect, the government asked Eiden if he knew that Jose was Spanish for Joe. When defense counsel objected ("that calls for an opinion, it's speculation, that's hearsay"), the court mercifully cut short the impending evidentiary debate. "I can answer that," the court announced, "Jose is Joseph in Spanish."

Simply put, Alanis has not shown, as he must to win a new trial on the basis of unpreserved claims of error, that the district court's management of his trial resulted in a miscarriage of justice. Federal district courts are entitled to question witnesses. *See* Fed.R.Evid. 614(b); *Evans*, 994 F.2d at 323. Although courts should be careful that their exercise of this prerogative does not unreasonably emphasize particular strands of testimony, there was nothing improper in the court's request that Torres confirm his identification before it be reflected in the record. Far from prejudicing Alanis, the court's observation that Torres was dealing with some "pretty tough characters" apparently was intended to prevent defense counsel from venturing into potentially inflammatory territory: Torres's account of fearing for his life promised to be far more powerful than the court's mild euphemism. (Defense counsel apparently got the point, for he quickly shifted gears.) Finally, Alanis's argument that the court's *sua sponte* translation "directed the jury to find that Jose was another name for Joseph" causes us little concern. We regard the court's remark as a sensible attempt to avoid a pointless and unseemly squabble. We observe furthermore—though to do so evinces a degree of seriousness which the argument hardly warrants-that a qualified Spanish interpreter presumably would have done no better that the court when it came to translating "Jose." Alanis therefore cannot demonstrate that he was prejudiced by the court's foray into the realm of bilingual education.

■ Our review of the record confirms that Alanis's trial was not conducted in an atmosphere of undue haste. Although during jury selection, which took place on a Wednesday morning, the court indicated that the trial would be over by Friday afternoon, there is nothing unusual in a court's providing potential jurors an estimate of a trial's length. Alanis points to the court's warnings to counsel that it would declare a mistrial if the trial were not completed by Friday's end. None of these warnings, however, was delivered in the jury's presence. It is apparent that the court's desire to have the trial completed by Friday did not restrict either side's presentation of its case. In fact, the court accommodated defense counsel's request for extra time on at least two occasions: on Thursday afternoon, when the court ended the proceedings early so that counsel could prepare his case-in-chief, and on Friday, when it granted an extended morning recess to allow both parties to review their closing arguments. As the government correctly observes, Alanis has pointed to "no instance when the court curtailed his cross examination, precluded his ability to call and elicit testimony from witnesses, or rejected his requests for a continuance."

The judgment of conviction is AFFIRMED.