IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 22, 2003 Session

**STATE OF TENNESSEE v. DANNY JOHNSON**

**Direct Appeal from the Circuit Court for Sequatchie County**
**No. 3858     Buddy D. Perry, Judge**

---

**No. M2002-02139-CCA-R3-CD - Filed December 23, 2003**

---

The appellant, Danny Johnson, was convicted by a Sequatchie County jury of two counts of rape of a child, Class A felonies, and one count of aggravated sexual battery, a Class B felony. Following a sentencing hearing, the trial court sentenced the appellant to an effective sentence of twenty-one years in the Tennessee Department of Correction. On appeal, the appellant challenges (1) the selection process of the venire from which grand and petit jurors were selected; (2) the trial court's failure to allow into evidence as an excited utterance the statement of Thomas Zervos regarding prior abuse of the victim; and (3) the sufficiency of the evidence. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOE G. RILEY and JAMES CURWOOD WITT, JR., JJ., joined.

M. Keith Davis (at trial and on appeal), L. Thomas Austin and Jennifer A. Mitchell (at trial), Dunlap, Tennessee, for the appellant, Danny Johnson.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steven H. Strain and Sherry Durham Gouger, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

On May 24, 1999, the Sequatchie County Grand Jury returned a six-count indictment charging the appellant with three counts of rape of a child and three counts of aggravated sexual battery. The appellant was initially tried by a jury in September 2000; however, the jury was unable to reach a verdict and the trial court declared a mistrial. Prior to declaring a mistrial, the trial court dismissed one count of rape of a child and two counts of aggravated sexual battery.

The appellant was retried on the remaining counts on April 16 and April 17, 2001. At trial, Sergeant David Robertson of the Dunlap Police Department testified that on December 13, 1998, he was called to the victim's home to interview the victim and the victim's mother about a possible child molestation. Sergeant Robertson related that during the interview the victim identified the perpetrator of the offense. After further questioning the victim, Sergeant Robertson directed the victim's mother to take him to T.C. Thompson Children's Hospital. Sergeant Robertson then contacted the Department of Children's Services (DCS) regarding the offense. At trial, Sergeant Robertson stated that he knew the appellant, but had "never had any dealings with him." He testified that the appellant lived across the street from the victim's house.

On cross-examination, Sergeant Robertson conceded that he did not collect any physical evidence from the appellant's home. However, Sergeant Robertson testified that he was merely the "responding officer." He explained that "if there's a crime . . . which would involve an investigation or other departments, then we just notify the investigator and then him or the chief would take it from there."

Vanessa Raulston, a Child Protective Services Case Manager with the Sequatchie County DCS, testified at trial that in December 1998 she was notified by local law enforcement of the possible sexual abuse of the victim. Raulston subsequently spoke with the victim's mother and Dr. Michael Tiger, who had examined the victim at T.C. Thompson Children's Hospital. Thereafter, Raulston referred the victim to the Children's Advocacy Center (CAC). At trial, Raulston explained that CAC is "a specialized doctor office set up in Chattanooga . . . and [the surrounding] counties . . . take children there for exams and they specialized in sex abuse exams."

Thomas Zervos, the victim's father, testified that the victim, his youngest son, was born in Ohio on June 6, 1989, and, at the time of trial, was almost twelve years old.[1] Zervos related that in May 1998, the family moved to Dunlap, Tennessee. Upon moving into their new house, the family met the appellant, who came over to introduce himself and help with the move. Zervos stated that the appellant lived across the street and quickly became a friend of the family. Zervos testified that the appellant's mother had agreed to sell the Zervos family property on which to build a house.

Zervos testified that his family and the appellant "ate together quite often," and the appellant went on vacation to Ohio with the Zervos family. Zervos related that he allowed the victim to go to the appellant's house alone. He explained that the appellant had purchased a video game system at a flea market, and the victim enjoyed going to the appellant's house to play the games. The victim also liked to go to the appellant's house to watch televised wrestling.

On cross-examination, Zervos stated that after making the instant allegations, the victim did not return to the appellant's house. Zervos conceded that he was upset about the sexual abuse of his son and that he called his friend, Robert Vandergriff, when the victim was taken to T.C. Thompson

---

[1] The Zervoses also have an adult son and daughter, twenty-six and twenty-seven years old respectively, who no longer live at home.

Children's Hospital. However, Zervos denied telling Vandergriff that "the same thing happened in Ohio and now it's happening down here." Zervos acknowledged that the victim was a hyperactive child. Additionally, he acknowledged that the agreement to purchase property from the appellant's mother "fell through," but he maintained that despite having made some improvements to the property, he was not upset about it. Zervos testified that his family had subsequently moved from Dunlap to Ohio, and then to Chattanooga, Tennessee.

At trial, the victim testified that he was eleven years old and in the sixth grade. He stated that he was in third grade when he and his family moved to Dunlap. The appellant lived alone across the street from the victim's house. He explained that the appellant had purchased a video game system and that he enjoyed going to the appellant's house to play the games. The victim testified that he also liked to watch wrestling on the appellant's television. The victim related that when he went to the appellant's house, he would go either alone or with his father.

According to the victim, the first incident of inappropriate conduct occurred in November 1998. The victim testified that he and the appellant were in the appellant's living room when the appellant began touching the victim's "private parts" through his clothes. Regarding the second incident occurring on December 1, the victim stated, "[The appellant] took me into the bedroom and he told me to bend over and pull my pants down and he stuck his front private in my rear private." The victim recalled that "it hurt" and that the appellant used "a white bottle of lotion." The appellant told the victim "not to tell anybody or he'[d] get in big trouble." The final incident occurred on December 11. The victim testified, "[The appellant] took me into the bedroom and he told me to bend over and pull my pants down and he took and put his front private into my rear private again." Once again, the appellant told the victim not to tell anyone.

Approximately two days later, the victim told his mother about the abuse. The victim's mother called the police and, shortly thereafter, Sergeant Robertson arrived. The victim related that after being questioned by Sergeant Robertson, he was taken to the hospital where Dr. Tiger examined his "privates." The victim testified that he was subsequently examined by Nurse Spada. The victim testified that he informed both Sergeant Robertson and DCS case worker Vanessa Raulston that the appellant had committed these offenses. The victim identified the appellant at trial.

On cross-examination, the victim stated that after December 11, 1998, he had no contact with the appellant. The victim acknowledged that prior to these offenses he had been going to the Joseph Johnson Mental Health Center. The victim stated that following the offenses, he and his family had moved to Ohio, then to Chattanooga.

At trial, Kathy Spada, a nurse at T.C. Thompson Children's Hospital, testified that she also worked at CAC, "an outreach program . . . trying to serve the kids who allege sexual abuse." She stated that law enforcement and DCS case workers refer child victims of sexual abuse to CAC. Spada testified that she had treated over three hundred (300) children at CAC, including the victim in the instant case.

Spada related that on December 22, 1998, the victim was brought to CAC by his mother. Spada testified that initially she conducted a regular physical exam to make the victim feel more comfortable. Next, she conducted a genital exam during which she observed no irregularities. Finally, Spada conducted an exam of the victim's anus. According to Spada, the victim "had given a history of having anal sex and . . . I noticed that there was flattening of the folds" and a loss of muscle tone. Spada testified that her observations were consistent with the victim's allegations. She further explained that in order to get flattening of the folds of this nature, "outside force" had to have been applied "at least a couple of times." However, Spada conceded that she was unable to identify the specific object that had been inserted into the victim's anus to create the flattening of the folds.

On cross-examination, Spada was unable to recall how long her examination of the victim had lasted. She further acknowledged that defecation could cause stretching of the rectal area. However, she maintained that the "need to go to the bathroom" would not cause flattening of the anal folds.

Dr. Michael Tiger, a pediatric resident, was working at T.C. Thompson Children's Hospital when the victim was brought into the emergency room. At trial, Dr. Tiger testified that the victim presented with a history of being a victim of both oral and anal sex. Dr. Tiger related that the victim was embarrassed and very tense when discussing what had happened to him. Thereafter, Dr. Tiger conducted a normal physical examination of the victim, followed by an examination of the victim's genitalia and anus. Dr. Tiger stated that although he did not observe flattening of the folds, he did discover two bruises around the victim's anus. Dr. Tiger explained, "Usually the bruise occurs from some sort of outside force." Dr. Tiger further related that he found no tearing or fissure of the anus, but he explained that this was not uncommon because the anus easily expands. Dr. Tiger testified that the bruising was consistent with penetration; however, he was unable to identify what object had penetrated the victim's anus. Upon discovering the bruises, Dr. Tiger contacted the local DCS and asked them to contact CAC in Chattanooga.

On cross-examination, Dr. Tiger acknowledged that he did not note in the victim's medical chart that the victim was tense, writing instead that the victim was "active, alert, and smiling . . . as well as embarrassed." Dr. Tiger further conceded that the bruising of the anus was opposite the alleged flattening of the anal folds. Dr. Tiger admitted that it was possible that the flattening of the folds was not present when he examined the victim. Dr. Tiger testified that during his examination on December 13, 1998, the victim reported that the last incident of abuse occurred "more than a week before." Moreover, Dr. Tiger related that he found nothing to indicate that there had been any sexual abuse "two days prior to [the] exam."

As its first witness, the defense recalled Vanessa Raulston, the DCS case manager who had interviewed the victim on three separate occasions regarding the alleged incidents of sexual abuse. Raulston related that at the first interview on December 15, 1998, the victim reported that these incidents occurred in the living room. She further stated that at the December 15 interview, the victim did not allege that he was sexually abused on December 11, 1998, and told her nothing about anal penetration or the use of lotion. However, Raulston testified that when questioned about which

-4-

part of his body the appellant touched, the victim circled the penis on a diagram of a young male child. Raulston stated that at the same interview, the victim told her that he saw the appellant's "privates" in November when the appellant fell upon getting out of the shower. The victim also reported that he saw the appellant's "privates" on December 1, explaining

> [The appellant] wanted me to touch him but I didn't. He was standing up and had blue jeans pulled down halfway and had on a John Deere Hat, white shirt and tenny [sic] shoes. I was lying on the floor [and] I turned around and said, "Yuk." Because he said, "Look." . . . [T]hen he pulled his pants up and then he drank some tea and smoked a cigarette. Dad called and I went home.

On cross-examination by the State, Raulston acknowledged that the victim told her that the appellant "had touched his private with his hand . . . and wanted to touch his private with his mouth[.]" Raulston explained that at a subsequent interview on December 29, the victim described the incidents of abuse occurring on December 1 and December 11, 1998, noting both the use of lotion and the anal penetration. Raulston maintained that there were no inconsistencies in the victim's statements and that at each interview the victim identified the appellant as the perpetrator of the offense.

Testifying on his own behalf at trial, the appellant related that he met the Zervos family when they moved across the street from his house. The appellant testified that he and the victim's father became close friends and because of that relationship he was "friendly" with the victim. The appellant stated that the Zervoses had agreed to purchase property owned by the appellant's mother. The appellant explained that the Zervoses planned to build a house on the property and began making the necessary improvements to the land. However, in early November or December 1998, the appellant informed the Zervoses that if they were unable to purchase the property by the end of the year, his mother wanted to "put the land up for real estate." The appellant testified that Tom Zervos "seemed mad," and thereafter their relationship changed. The appellant stated that he believed the Zervoses made the instant allegations because they were angry.

The appellant testified that prior to the instant allegations, the victim and his father would come to the appellant's house. He insisted that the victim never came to his house alone, except on one occasion when the appellant's daughter was present. The appellant further related that the victim had a bad temper. On cross-examination, the appellant explained that, because of the victim's "unruly" behavior, he did not allow the victim to come to his house without his parents. The appellant acknowledged that when the victim and his father came to the appellant's house, the victim liked to play with the Nintendo Game System. The appellant also conceded that he was not certain that the Zervoses made the instant allegations because they were upset about being unable to purchase the property.

Betty Sturgeon and David Sanders also testified at trial on behalf of the appellant. They testified that in December 1998 they lived near the appellant and the Zervoses. Sturgeon related that the victim often played with her eleven-year-old son. Sturgeon claimed that the victim was a "liar."

Sanders testified that Tom Zervos was upset when the "real estate deal" between the appellant's mother and the Zervoses "fell through." Both Sturgeon and Sanders insisted that they never saw the appellant alone with the victim.

Robert Vandergriff testified that he was acquainted with Tom Zervos. He related that in December 1998, he received a telephone call from Zervos. He testified that Zervos sounded concerned, explaining, "He said the same thing happened [in Ohio] as what happened here . . . ." On cross-examination, Vandergriff acknowledged that he met Zervos through the appellant. He related that he had known the appellant for five years. Vandergriff conceded that during their telephone conversation, Zervos never mentioned the word "rape."

In rebuttal, the State called Norman L. Johnson to testify. Johnson testified that in the fall of 1998 he was riding on his "four-wheeler" when he observed the Zervoses looking at property owned by the appellant and his mother. Johnson related that the Zervoses planned to build a house on this property. According to Johnson, the appellant subsequently drove up and the victim was in the vehicle with him. Johnson testified that the victim got out of the vehicle and the Zervoses and the appellant then drove away at the same time.

Based upon the foregoing testimony, the jury convicted the appellant of two counts of rape of a child and one count of aggravated sexual battery. Following a sentencing hearing, the trial court sentenced the appellant to an effective sentence of twenty-one years incarceration. On appeal, the appellant challenges (1) the selection process of the venire from which grand and petit jurors were selected; (2) the trial court's failure to allow into evidence as an excited utterance the statement of Thomas Zervos regarding prior abuse of the victim; and (3) the sufficiency of the evidence.

## II. Analysis

A. Juror Selection

As previously noted, on May 24, 1999, a Sequatchie County grand jury returned a six-count indictment charging the appellant with three counts of rape of a child and three counts of aggravated sexual battery. The appellant was initially tried in September 2000, which trial resulted in a mistrial. Prior to retrial, the appellant filed for the first time a motion to quash the jury panel and a motion to dismiss the indictment, alleging that the method for selecting the grand and petit juries in Sequatchie County violated his rights to due process and equal protection of the laws under the Fifth and Fourteenth Amendments of the United States Constitution, and his right to have a grand jury selected from a representative cross-section of the community under the Sixth and Fourteenth Amendments of the United States Constitution.

On February 5, 2001, the trial court held a hearing to consider various pretrial motions, including the appellant's motions to quash the jury panel and to dismiss the indictment. At the hearing, Patsy Frizzell, the Circuit Court Clerk for Sequatchie County, testified that during the time that she had served as circuit court clerk, the jury venire had been selected from a list of registered

drivers, which list was provided to the jury commission every two years by the Tennessee Department of Safety. Frizzell related that the names from the list were placed in a locked box located in the "sessions office," which office was unused. Frizzell stated that as the circuit court clerk, she was present when the jury commission met to draw the names for the venire. According to Frizzell, the box was unsealed and, without looking, one of the jury commissioners reached into the box and randomly selected the names of the persons to be placed on the venire. Frizzell related that the jury commission no longer had a child under ten years old draw the names of the venire, nor was the jury commissioner who drew the names blindfolded during the process. When asked if the commission excluded the names of persons sixty-five years of age and older, Frizzell explained that although they did not check every name, if the jury commissioners "happen[ed] to see one that's over 65," they excluded that name from the venire. Frizzell testified that she did not know the percentage of the population of Sequatchie County that was over sixty-five years old.

Linda Pittman, a Sequatchie County jury commissioner, also testified regarding the process for selecting jurors in Sequatchie County. Pittman stated that names from a list of registered drivers were placed in the jury box, "a drum that you roll over, kind of like a lottery." Pittman explained that when the time came to select a new jury venire, one of the commissioners reached into the jury box without looking and selected the names. Thereafter, the jury commission reviewed the selected names and removed any persons who were not competent to serve, such as convicted felons. Pittman testified that the commission also excluded persons sixty-five years or older if they were known to be unable to serve.

Based on the foregoing testimony and the arguments of counsel, the trial court denied the appellant's motion to quash the jury panel. Relying on Pittman's testimony that the jury commission excluded persons sixty-five and older from the jury venire only if they were known to be unable to serve, the trial court determined that the appellant had failed to prove that the jury commission purposefully excluded all individuals from that age group. The trial court also found that the use of a list of registered drivers from which to select potential jurors and allowing a jury commissioner to draw names from the jury box without being blindfolded constituted minor deviations from the statutory jury selection procedures, thereby requiring the appellant to demonstrate prejudice. The trial court determined that the deviations were not so "flagrant" as to require the jury panel to be quashed. Thereafter, trial was set for February 7, 2001. However, on the day of trial, the trial court interrupted voir dire and asked whether any of the potential jurors were sixty-five years of age or older. Upon discovering that none of the approximately one hundred six persons were sixty-five years or older, the trial court quashed the jury panel.

Once a new jury venire was selected, the case was reset for trial. On the first day of trial, prior to voir dire, defense counsel asked the trial court to rule on his previous motion to dismiss the indictment, which indictment had been issued by a grand jury drawn from the same venire as the petit jury that had been quashed. The trial court denied the motion, finding that the appellant had waived the challenge to the indictment by failing to raise the issue prior to the initial trial which resulted in a mistrial. On appeal, the appellant raises several issues regarding the selection process of the venire from which the grand jurors were selected.

First, we address the appellant's contention that he did not waive his right to challenge the indictment based upon defects in the selection of the grand jury by failing to raise the issue prior to his initial trial which resulted in a mistrial. A mistrial is defined as "[a] trial that ends inconclusively because the jury cannot agree on a verdict." Black's Law Dictionary 1018 (7th ed. 1999). This court has previously observed that the term "mistrial" is "loosely employed to denote any trial not resulting in a lawful verdict. In legal effect, it is 'equivalent to no trial at all.'" State v. Spears, 780 S.W.2d 776, 778 (Tenn. Crim. App. 1989) (quoting 88 C.J.S. Mistrial § 92). The subsequent retrial is a new trial altogether. Id.; see also Johnny L. Blake v. State, No. 64, 1990 Tenn. Crim. App. LEXIS 505, at *6 (Jackson, Aug. 1, 1990). Accordingly, we conclude that the appellant has not waived his right to challenge the indictment or the method by which the jury venire was selected.

Next, the appellant asserts that the removal of the names of persons sixty-five years and over from the jury venire violated his right to equal protection under the law.[2] In support of his assertion, the appellant cites various United States Supreme Court cases recognizing that a criminal defendant's right to equal protection under the law is denied when the defendant is indicted by a grand jury from which individuals of the defendant's race or color have been purposefully excluded. Rose v. Mitchell, 443 U.S. 545, 99 S. Ct. 2993 (1979); Castaneda v. Partida, 430 U.S. 482, 97 S. Ct. 1272 (1977). The appellant contends that the same logic applies to age-based discrimination.

In order to establish a prima facie case of purposeful discrimination under the Equal Protection Clause of the Fourteenth Amendment, an appellant must show that (1) the group excluded from service on the grand jury is one that is a recognizable, distinct class capable of being singled out for different treatment under the laws; (2) the selection procedure used by the State to select grand jurors is subject to abuse or is not racially neutral; and (3) the distinct class has been under represented on venires for a significant period of time.[3] See State v. Evans, 838 S.W.2d 185, 193 (Tenn. 1992) (citing Castaneda v. Partida, 430 U.S. 482, 494, 97 S. Ct. 1272, 1280 (1977)). Various state courts addressing the issue have determined that age groups do not constitute "cognizable" or "distinct" groups within the community. State v. Allen, 845 S.W.2d 671, 673 (Mo. Ct. App. 1993) (age is not a cognizable group); Burks v. State, 583 S.W.2d 389, 391 (Tex. Crim. App. 1979) (defendant failed to demonstrate that persons of the age 18 to 21 constitute a distinctive group); State v. Hardy, 235 S.E.2d 828, 834 (N.C. 1977) (persons 18 to 21 do not constitute an identifiable group). In Murphy v. Johnson, 205 F.3d 809, 819 n.3 (5th Cir. 2000), the Court of Appeals for the Fifth

---

[2] We note that Tennessee Code Annotated section 22-1-103(a)(5) (Supp. 2003) provides that "[a]ll persons over sixty-five (65) years of age, disabled by bodily infirmity or specially exempted by any other positive law," are exempt from liability to act as jurors. However, this exemption is personal, to be claimed or waived by the prospective juror entitled to the exemption. Cooper v. State, 847 S.W.2d 521, 533 (Tenn. Crim. App. 1992). The trial court is authorized to discharge a grand or petit juror "who does not possess the requisite qualifications, or who is exempt or disqualified from such service, or for any other reasonable or proper cause, to be judged by the court." Tenn. Code Ann. § 22-1-106 (1994). Thus, the jury commission erred in removing those persons on its own initiative. Cooper, 847 S.W.2d at 533. Nevertheless, "the fact that an incorrect procedure was followed does not automatically equate with constitutional error." Id.

[3] The appellant is not required to be a member of the excluded class. Campbell v. Louisiana, 523 U.S. 392, 118 S. Ct. 1419 (1998).

Circuit expressed doubt as to whether a defendant would be entitled to relief on equal protection grounds for the alleged systematic exclusion of young adults, citing several federal courts of appeals cases in which the courts concluded that young persons between the ages of eighteen and thirty were not a "cognizable" or "distinctive" group within the community. See Wysinger v. Davis, 886 F.2d 295, 296 (11th Cir. 1989) (age alone does not identify an identifiable group); Ford v. Seabold, 841 F.2d 677, 681-82 (6th Cir. 1988) (young adults are not a cognizable group); Johnson v. McCaughtry, 92 F.3d 585, 590-93 (7th Cir. 1996) (18 to 25 year olds do not constitute cognizable group). Although the majority of these cases address young adults ages eighteen to twenty-five, we are unable to conclude that persons sixty-five years of age and older constitute a "distinct" and "cognizable" group. Accordingly, the appellant has failed to establish a prima facie case of purposeful discrimination.

The appellant also asserts that the exclusion of persons sixty-five years and over from the jury venire violated his right to have a grand jury selected from a representative cross-section of the community. In Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979), the United States Supreme Court set forth a three-pronged test for determining whether a jury was properly selected from a fair cross-section of the community pursuant to the Sixth and Fourteenth Amendments. To establish a prima facie violation of the fair cross-section requirement, the appellant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process. Duren, 439 U.S. at 363, 99 S. Ct. at 668. This court has previously stated that it was not willing "to say that the age of 65 should mark the boundary for a cognizable element of society." State v. Blunt, 708 S.W.2d 415, 418 (Tenn. Crim. App. 1985). This court reasoned, "why would a juror sixty-three (63) years of age not represent the same interests, as say, a juror sixty-six (66) years old." Id.; see also Cooper v. State, 847 S.W.2d 521, 534 (Tenn. Crim. App. 1992) (concluding that persons over seventy-five do not constitute a cognizable group). Accordingly, the appellant has failed to establish a prima facie violation of the right to have a grand jury selected from a representative cross-section of the community.

Finally, the appellant contends that "[t]he method by which the grand jury was selected was in violation of the statutes governing the manner of selecting jurors and as a result, [in violation of the appellant's] procedural due process." Tennessee Code Annotated section 22-2-302(a)(1) (1994) provides that

> [t]he board of jury commissioners shall meet in the circuit court clerk's office at a time fixed by the judge or judges appointing the board, and on the first Monday in the month in which such original meeting is held every two (2) years thereafter, and shall then and there select, from the tax records of the county, and records or lists of persons eighteen (18) years of age and older residing in the county who are licensed to drive, or other available and reliable sources, but shall not include the permanent voter registration records as the sole

> or primary source, a list of names of upright and intelligent persons known for their integrity, fair character and sound judgment who are otherwise legally qualified . . . to serve as jurors in the circuit and criminal courts of such county for the ensuing two (2) years.

The appellant seeks to have his convictions reversed based upon the fact that jury venire from which the grand jury was selected was drawn from a list comprised solely of registered drivers. The appellant argues that Tennessee Code Annotated section 22-2-302(a)(1) requires that the list include names from the county tax records. However, our supreme court has previously approved the use of a list of driver's license rolls in selecting jury venires. State v. Mann, 959 S.W.2d 503, 535 (Tenn. 1997) (appendix); see also State v. Wayne Joseph Burgess, Jr., No. M1999-02040-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 39, at **10-11 (Nashville, Jan. 18, 2001). Accordingly, we conclude there was no error in selecting the jury venire from a list of registered drivers. This issue is without merit.

## B. Evidentiary Issue

The appellant's next contention involves the testimony of Robert Vandergriff regarding the statement made by the victim's father, Thomas Zervos, that "the same thing happened [in Ohio] as what happened here." The appellant contends that the trial court committed error when it determined that the statement was admissible solely for impeachment purposes as a prior inconsistent statement. The appellant asserts that the statement constituted an excited utterance and, thus, should have been admitted as substantive evidence. The State maintains that the statement did not qualify as an excited utterance, but was a "classic example of a prior inconsistent statement."

The rules of evidence provide for an excited utterance exception to the hearsay rule. Tenn. R. Evid. 803(2). An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Id.; see also State v. Gordon, 952 S.W.2d 817, 819 (Tenn. 1997). In order for a statement to qualify as an excited utterance, (1) there must be a startling event or condition; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant is under the stress or excitement from the event or condition. Gordon, 952 S.W.2d at 820. "The ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993). Moreover, "it is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996).

In the instant case, learning that his son had been sexually abused undoubtedly qualified as a startling event. Additionally, when read in context, Zervos's statement, "the same thing that happened in Ohio was happening here," related to his son's abuse. Zervos testified at trial that he called Robert Vandergriff when the victim was taken to T.C. Thompson Children's Hospital. Our review of the record reflects that the victim was taken to the hospital on December 13, 1998, shortly

after Zervos learned of the sexual abuse. Zervos and Vandergriff testified that Zervos was "upset" and "concerned" when he called Vandergriff. Based upon these facts, we conclude that the alleged statement was made while Zervos was under the stress of learning that his son had been sexually abused. Accordingly, the statement qualified as an excited utterance, and the trial court abused its discretion by finding that the statement was admissible only as a prior inconsistent statement.

Nevertheless, we conclude that the trial court's failure to admit the statement as an excited utterance was harmless error. An error will not be grounds for reversal unless it affirmatively appears to have affected the result of the trial on the merits. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). In light of the overwhelming evidence against the appellant, we are unable to conclude that the admission of the statement as substantive evidence under the excited utterance exception to the hearsay rule would have affected the outcome of the trial. Thus, the appellant is not entitled to relief on this issue.

C. Sufficiency of the Evidence

Finally, the appellant contends that the evidence presented at trial was insufficient to sustain his convictions. The appellant bases his contention on the conflicts in the testimonies of Spada and Dr. Tiger regarding the injuries to the victim, and the inconsistencies in the victim's testimony at trial and his statements to Raulston and Dr. Tiger. Additionally, the appellant challenges his conviction for the rape of the victim allegedly occurring on December 11, 1998. The appellant relies on the testimony of Dr. Tiger that during his examination of the victim on December 13, 1998, he found no indication of sexual abuse within the "two days prior to [the] exam," and the victim told him that the last incident of abuse occurred "more than a week before."

When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Should the reviewing court find particular conflicts in the trial testimony, the court must resolve the conflicts in favor of the jury verdict. Tuggle, 639 S.W.2d at 914. This court will not reweigh or reevaluate the evidence. Bland, 958 S.W.2d at 659.

Tennessee Code Annotated section 39-13-522(a) (1997) provides that "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant . . . , if such victim is less than thirteen (13) years of age." Sexual penetration is defined as "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7) (1997). "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant . . . [and] the victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4) (1997). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). Additionally, we note that "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." Tenn. Code Ann. § 39-13-501(2).

The appellant was convicted of two counts of rape of a child and one count of aggravated sexual battery. The victim testified at trial that in November 1998, he and the appellant were in the appellant's living room when the appellant began touching the victim's "private parts" through his clothes. The victim further related that on December 1 and December 11, 1998, the appellant took the victim into the bedroom, told the victim to bend over and pull down his pants, and "stuck his front private in [the victim's] rear private." The victim recalled that "it hurt" and that the appellant used "a white bottle of lotion." The victim and his father testified that the victim was eleven years old at the time of trial.

Vanessa Raulston, the DCS case manager who interviewed the victim regarding these incidents of sexual abuse, testified that on a diagram of a male child, the victim was asked to circle the part of the body inappropriately touched by the appellant. The victim circled the penis. Raulston also testified that the victim alleged two separate incidents of anal penetration occurring on December 1 and December 11, 1998. Nurse Kathy Spada testified at trial that when she examined the victim at CAC she observed a loss of muscle tone and flattening of the folds around the anus. She related that these observations were consistent with the victim's allegations of anal penetration, stating that an "outside force" had been applied "at least a couple of times." Finally, Dr. Michael Tiger testified that although he did not observe the flattening of the anal folds when he examined the victim in the emergency room on December 13, 1998, he did discover two bruises around the victim's anus, which bruises were consistent with penetration.

Taken in the light most favorable to the State, the evidence is sufficient to support the appellant's convictions for the rape and the aggravated sexual battery of the victim. Moreover, we find no merit in the appellant's arguments regarding the conflicts in the testimonies of Spada and Dr. Tiger, or the inconsistencies in the victim's testimony and his statements to other witnesses. As we have noted, questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. Bland, 958 S.W.2d at 659. Additionally, on appeal, conflicts in the trial testimony must be

resolved in favor of the jury verdict. <u>Tuggle</u>, 639 S.W.2d at 914. This court will not reweigh or reevaluate the evidence. <u>Bland</u>, 958 S.W.2d at 659. This issue is without merit.

### III. Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE