In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2779

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSEPH B. MILLER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:12-CR-10 — **James T. Moody**, *Judge.*

ARGUED APRIL 9, 2015 — DECIDED JULY 22, 2015

Before FLAUM, RIPPLE, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* In 2013, a federal jury found Joseph
Miller guilty of bank robbery. Miller now seeks a new trial,
which he believes is warranted for two reasons: first, Miller
contends that an FBI agent offered false testimony during his
trial, and second, he argues that his trial counsel provided
constitutionally ineffective assistance by failing both to seek
suppression of an in-court identification and to challenge the
credibility of the testifying FBI agent via cross-examination

on certain specified issues. Because we conclude that neither the agent's alleged misstatements nor counsel's purported errors affected the outcome of Miller's trial, we affirm the district court's denial of his new trial motion.

## I. Background

On December 13, 2011, a clean-cut male in his late 30s or early 40s robbed the Standard Bank & Trust in Hammond, Indiana. The robber wore a thigh-length leather coat, black sneakers with red stitching, and a green-and-white baseball cap with a Chicago Bulls logo. He approached bank teller Judith Tauber, who was standing next to her supervisor Pakama Hoffman, and handed Tauber a note demanding money. Tauber quickly turned over some $5,000 in cash. The robber then exited the bank and headed in the direction of Amtech Technology Systems, a nearby business. He climbed into a blue Ford Explorer with Illinois plates and drove off. The vehicle was captured on Amtech surveillance video.

FBI Agent Michael Peasley reviewed the surveillance footage but, after attempting to sharpen the image, could not identify the Explorer's license plate number. He sent the video footage to the Lake County High Intensity Drug Trafficking Area ("HIDTA") Task Force, where the image was refined so that all but one digit on the license plate became legible. Using the enhanced image, Agent Peasley searched the Illinois vehicle registration database and entered each of the ten possible license plate combinations. One of those combinations matched the plate number of a Ford Explorer registered to defendant-appellant Joseph Miller, who lived a few miles outside of Hammond, in Lansing, Illinois.

The FBI conducted surveillance of Miller for several days. Agent Peasley observed Miller's Ford Explorer parked outside of his home and, based on the vehicle's distinctive characteristics, including stickers, rain dams, and window tinting, Agent Peasley concluded that Miller's Explorer was the same vehicle captured on the Amtech video. During the surveillance period, Miller and his girlfriend, Debra Loggins, were the only individuals seen driving the vehicle. On January 5, 2012, agents searched Miller's home with Loggins's consent and recovered a black leather jacket resembling that worn by the bank robber. The agents also seized Miller's black sneakers, which featured red stitching and distinctive tabs that matched the embellishments on the robber's sneakers. They did not locate any cash or a Chicago Bulls hat, though Loggins's daughter stated that Miller and Loggins owned matching green-and-white Chicago Bulls baseball caps.

That same day, Agent Peasley questioned Miller at the Lansing, Illinois police station, where he advised Miller of his *Miranda* rights. Miller initially denied involvement in the robbery, though when Agent Peasley showed him a photo of the robber and the Ford Explorer in the Amtech parking lot, Miller responded, "That's my vehicle, but that's not me." Forty-five minutes into the interview, however, Agent Peasley asked Miller if he had a firearm, to which Miller replied, "I did not have a gun." Understanding this to mean that Miller was admitting to the robbery, Agent Peasley clarified, "You mean you didn't have a gun during the robbery," to which Miller replied, "Yes." Miller also explained that, following the robbery, he had thrown the Chicago Bulls cap into a nearby dumpster. This conversation was not recorded, and Miller did not sign a written confession.

Early in the investigation, Agent Peasley provided photo arrays to both Tauber and Hoffman, the Standard Bank witnesses. Hoffman pointed at Miller's picture in the array but stated that she could not be 100% certain that he was the robber. Tauber pointed to Miller's photo and recalled that she had thought the bank robber resembled a courier who she had previously seen at the bank. Miller's photo, she explained, reminded her of that same courier. In support of the criminal complaint against Miller, Agent Peasley submitted an affidavit recounting the photo line-up with Tauber. The affidavit reads, in pertinent part:

> [When] law enforcement showed a photo line-up containing a photo of Miller and five other subjects to [Tauber,] [s]he pointed to the photo of Miller and said, "He looks familiar to me." [Tauber] explained that when she was being robbed, she thought the man reminded her of a courier who comes into the bank. When she saw the photo of Miller, she again thought the photo reminded her of the courier.

Tauber later reviewed Agent Peasley's affidavit and disagreed with its characterization of her statements. She clarified that the photograph of Miller "looked familiar, *because* it reminded her of the courier, not because the photograph looked like the bank robber." When Miller learned of this discrepancy, he moved to depose Tauber prior to trial. The district court denied Miller's motion after the government explained that it "expect[ed] [Tauber's] trial testimony to be—that she did not identify the photograph as the bank robber." Tauber, in fact, died shortly thereafter and no evi-

dence relating to her observations upon viewing the photo array was introduced at trial.

At Miller's June 2013 trial, video footage from both Standard Bank and the Amtech parking lot was admitted. Hoffman testified as the sole eyewitness. Although she had been unable to pick Miller out of the photo array, Hoffman made an in-court identification of Miller as the robber at trial. Miller's attorney, Adam Tavitas, did not object to the admission of Hoffman's identification. However, on cross-examination, Tavitas emphasized that Hoffman had observed the robber only briefly and had been unable to identify Miller in the photo array presented to her shortly after the robbery. Loggins's daughter also testified at trial, identifying the robber's green-and-white baseball cap as a hat identical to one Miller had owned. Loggins herself denied previously seeing Miller with a green-and-white Bulls hat. She also denied several prior statements she had made to law enforcement, but admitted telling agents that Miller was the individual in the Amtech surveillance footage. When again confronted with the footage during trial, Loggins stated that she was unable to identify the person depicted. However, Loggins did positively identify the car in the image as Miller's Ford Explorer.

Agent Peasley also testified at trial, and described the circumstances surrounding Miller's confession and other details relating to the investigation. When questioned about his identification of Miller's vehicle, Agent Peasley explained that he reviewed the Amtech surveillance tape and was eventually able to read all of the digits on the vehicle's license plate, with the exception of one number. Agent Peasley's testimony continued as follows:

Q. And did you do anything to enhance your ability to read th[e license plate]?

A. We played with the video quite a lot. We looked at could we adjust the colors, even invert the colors, do anything we can to bring out those numbers. And we continued to do that and then got to the point where we were able to read all but that one digit. So we then started playing with those digits in the registration system database to look and see if we could find a match.

Q. All right. And let me just have you explain something you just said. You said you were playing with the video. Did you make any changes or enhancements–

A. No.

Through Agent Peasley, the government also admitted various financial records. Records from Miller's electric company confirmed that his bill had been delinquent prior to the robbery but was paid the day after the robbery. Bank account records revealed that Miller's account was overdrawn by $159.82 on the morning of the robbery and that two cash deposits totaling $370 were made into his account later that same day. Agent Peasley testified, however, that Miller's account was "delinquent by about 730 something dollars [on the morning of] the bank robbery." The government referenced this $730 figure during its closing argument.

Tavitas cross-examined Agent Peasley on several issues. He emphasized that Agent Peasley did not record the inter-

view in which Miller purportedly confessed, and pointed out other shortcomings in the investigation, including that no handwriting exemplar was obtained from Miller, no fingerprints or DNA were recovered from the scene, and no stash of money was found at Miller's house. Tavitas did not question Agent Peasley about Tauber's statements in relation to the photo array, nor did he attempt to correct Agent Peasley's testimony regarding the amount by which Miller's account was overdrawn. Ultimately, Miller was found guilty of bank robbery in violation of 18 U.S.C. § 2113(a), and sentenced to 225 months' imprisonment.

Represented by new counsel, Miller filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. He argued that Tavitas provided constitutionally ineffective assistance, first, because he did not introduce evidence that Agent Peasley's affidavit "mischaracterized" Tauber as having identified Miller as the robber; second, because he did not object to Agent Peasley's testimony regarding the enhancement of the license plate images;[1] and third, because Tavitas did not challenge Agent Peasley's incorrect assertion that Miller's bank account was more than $700 overdrawn on the day of the robbery.

At an evidentiary hearing, Agent Peasley testified that he had sent the Amtech video to HIDTA staff who "took a look at the video to try to clear it up to see if we could see what

[1] On appeal, Miller has abandoned the argument that Tavitas's failure to cast doubt on Agent Peasley's explanation of how he determined ownership of the vehicle in the Amtech video amounted to ineffective assistance. Instead, Miller claims that Agent Peasley's allegedly false testimony regarding the license plate verification process impacted his right to a fair trial.

the [license plate] tag was." He also attempted to clarify the image on his own but was unsuccessful. Agent Peasley admitted he could not recall exactly how the video was sent to HIDTA, who adjusted its sharpness, or what techniques were used to do so. He believed HIDTA "simply adjusted aspects of the image, so—like, they adjusted the color ration [sic]. They adjusted the zoom level. They adjusted sharpness of the photos." However, he insisted that HIDTA "did not change the photograph." Agent Peasley also admitted that he erred in testifying that Miller's bank account was overdrawn by approximately $730 on the day of the robbery. He explained that he had mistakenly conflated the relevant pre-robbery account balance (-$159.82) with Miller's account balance a few weeks after the robbery (-$713).

Tavitas also testified at the hearing regarding his representation of Miller. He explained that he did not question Agent Peasley about Tauber's statements because he did not want to introduce evidence that might allow the jury to infer that Tauber thought Miller resembled the robber. Tavitas also stated that it was not part of his trial strategy to challenge the assertion that the car in the Amtech lot belonged to Miller, as Miller and Loggins had both admitted to Agent Peasley that the car in the Amtech lot was his. Rather, Tavitas's trial strategy was to argue that the car was Miller's, but that the man in the video was someone else. Tavitas therefore saw no need to cross-examine Agent Peasley regarding the process by which he verified the robber's license plate number. Tavitas could not explain his failure to correct Agent Peasley's misstatement with respect to Miller's bank records.

The district court denied Miller's new trial motion. First, it found no ineffectiveness relating to Tavitas's choice not to

cross-examine Agent Peasley about Tauber's pre-trial state-
ments, concluding that Tavitas had made a "sound tactical
decision." The court also concluded that Tavitas acted per-
missibly in declining to question Agent Peasley about the
license plate enhancement process as Tavitas had explained
that he did not intend to argue at trial that the vehicle on the
scene did not belong to Miller. Finally, the district court as-
sumed that Tavitas's failure to correct Agent Peasley's testi-
mony regarding Miller's bank account balance was error but
that, considering the strength of the government's case, it
did not prejudice Miller.

## II. Discussion

On appeal, Miller continues to press the argument that
Tavitas's assistance was constitutionally ineffective. He also
cites Agent Peasley's statements regarding the enhanced li-
cense plate footage and the amount by which Miller's bank
account was overdrawn in support of an independent claim
that the government offered false testimony at trial.[2] Miller
contends that there is a reasonable likelihood that Agent
Peasley's purportedly false testimony and Tavitas's alleged
errors affected the jury's verdict. We disagree.

---

[2] Because Miller did not raise his false testimony claim below, that claim
is arguably waived as we have "repeatedly held that a party that fails to
press an argument before the district court waives the right to present
that argument on appeal." *Garlington v. O'Leary*, 879 F.2d 277, 282 (7th
Cir. 1989). However, because the government has not argued waiver—
and because "it is our practice to consider only those arguments present-
ed to us"—we decline to address the waiver issue and will proceed to
analyze Miller's false testimony claim on the merits. *Id.* at 282–83 (recog-
nizing that "a defense of waiver can itself be waived by not being
raised").

**A. False Testimony**

Miller argues that he is entitled to a new trial based on Agent Peasley's allegedly false testimony on two points: (1) the process by which the Amtech surveillance footage was enhanced, and (2) the balance of Miller's bank account on the morning of the robbery. In order to receive a new trial on the basis of the government's use of false testimony, Miller must establish that the government's case included perjured testimony; that the government knew, or should have known, of the perjury; and that there is a likelihood that the false testimony affected the judgment of the jury. *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995).

Miller first claims that Agent Peasley testified falsely when questioned about his ability to read the license plate number from the vehicle captured on the Amtech surveillance video. When asked whether he enhanced the image in order to read the number, Agent Peasley explained that "we" used various techniques to clarify the image. According to Miller, this implied that Agent Peasley *himself* had adjusted the image and identified the license plate number when in reality an unknown HIDTA employee refined the image (using unknown techniques) and provided Agent Peasley with the enhanced footage.

It is not immediately clear to us that the challenged testimony was false. While Agent Peasley's language was admittedly ambiguous and imprecise, it is plausible that when he used the term "we," he was simply referring both to his own unsuccessful efforts and the more successful efforts of the HIDTA staff to enhance the Amtech footage. Nevertheless, we agree with Miller that the most obvious inference to be drawn from Agent Peasley's summary description of the

image refinement process was that he himself was responsible for sharpening the image that enabled him to initially connect the getaway vehicle to Miller—not that he was blindly relying on information provided to him by a third party.[3]

Even so, we do not believe that this admittedly flawed testimony affected the jury's verdict. First, Tavitas had ample opportunity to bring to light any false or misleading statements on cross-examination and did, in fact, elicit an admission from Agent Peasley that he received "additional help" in identifying the license plate number and that he "didn't do this [him]self." *See United States v. Adcox*, 19 F.3d 290, 295 (7th Cir. 1994) (explaining that "whether the defendant had adequate opportunity to expose the alleged per-

---

[3] Because Agent Peasley's testimony conveyed the assertion that the license plate captured on the Amtech surveillance video matched Miller's plates—an assertion made by an individual other than Agent Peasley, who himself was uninvolved in the HIDTA image refinement process—his testimony also presented potential hearsay and Confrontation Clause problems. *See* Fed. R. Evid. 801; *Davis v. Washington*, 547 U.S. 813, 821 (2006) (holding that the Confrontation Clause of the Sixth Amendment "bars admission of testimonial statements of a witness who did not appear at trial" (citation and internal quotation marks omitted)). Given these considerations, it would have been preferable for the government to instead call as a witness a HIDTA employee with personal knowledge of the license plate enhancement process. But ultimately, because the defense did not challenge the government's contention that the vehicle depicted in the Amtech footage belonged to Miller, any hearsay or Confrontation Clause violation would have been harmless. *See United States v. Westmoreland*, 240 F.3d 618, 629 (7th Cir. 2001) ("Even if hearsay statements are improperly admitted into evidence at trial, a conviction will not be set aside if erroneous rulings under both [the Federal Rules of Evidence] and the Confrontation Clause are harmless.").

jury on cross-examination" is crucial in determining whether a new trial is merited). More importantly, the license plate identification process proved to be only a collateral matter at trial. Because both Miller and Loggins had admitted that the vehicle in the Amtech lot belonged to Miller, the defense did not attempt to challenge that assertion. And, separate and apart from its license plate number, Miller's Ford Explorer possessed certain other distinctive characteristics (e.g., window stickers, a chrome bumper, tinted windows, and rain dams) that enabled Agent Peasley to identify Miller's vehicle as the vehicle present at the scene of the crime. Therefore, Agent Peasley's potentially misleading statements about the license plate identification process were not essential to the factual finding that the getaway car belonged to Miller.

Miller also challenges Agent Peasley's statement at trial that Miller's bank account was overdrawn by approximately $730 on the morning of the robbery. At the evidentiary hearing on Miller's new trial motion, Agent Peasley acknowledged that this testimony was incorrect; in reality, Miller's account was overdrawn by only $159.82. However, it is unlikely that this concededly false statement affected the judgment of the jury. Details of Miller's negative account balance were offered to prove motive to commit robbery. The fact that Miller's account was overdrawn by less than Agent Peasley suggested may lessen his motive, but it does not negate it, nor does it alter the fact that deposits were made to Miller's account (and his overdue electric bill paid) just after the robbery. Furthermore, the remaining evidence of Miller's guilt is powerful: his vehicle was captured on surveillance video near the bank at the time of the robbery; there is video footage of a man with a similar build and similar distinctive clothing entering the vehicle; Agent Peasley testified that

Miller confessed to committing the robbery; and, although Hoffman's in-court identification of Miller may not be entitled to much weight (as we explain below), it is an additional factor that weighs in favor of the government's case. We are therefore convinced that the effect on the jury of Agent Peasley's overstatement regarding the status of Miller's bank account was negligible. As a result, Miller's claim to a new trial based on Agent Peasley's false testimony fails.

**B. Ineffective Assistance of Counsel**

Miller next contends that he is entitled to a new trial on the ground that Tavitas's representation was constitutionally inadequate. In considering a claim of ineffective assistance of counsel, we review the district court's conclusions of law de novo and its factual findings for clear error. *United States v. Traeger*, 289 F.3d 461, 470 (7th Cir. 2002).

To prevail on an ineffective assistance claim, a defendant must satisfy the demanding standard set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Miller must demonstrate both that Tavitas's performance fell below an objective standard of reasonableness and that Miller was prejudiced as a result of that deficient performance. *Id.* at 687–88. With respect to the "performance" prong of the *Strickland* test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (citation and internal quotation marks omitted). As for the "prejudice" prong, the Supreme Court has required defendants to establish "a reasonable probability that, but for counsel's unpro-

fessional errors, the result of the proceeding would have been different." *Id.* at 694. Miller contends that Tavitas committed three errors during trial that rendered his representation inadequate: first, Tavitas did not attempt to suppress Hoffman's in-court identification of Miller as the robber; second, Tavitas did not cross-examine Agent Peasley about Tauber's clarification of statements she made while examining the photo array; and third, Tavitas did not correct Agent Peasley's overstatement of Miller's bank account deficit on the morning of the robbery.

Miller first alleges that Tavitas's decision not to move to suppress Hoffman's in-court identification constituted ineffective assistance. Hoffman, a Standard Bank employee, identified Miller as the robber when she observed him sitting at defense counsel's table at trial. When previously presented with a photo array during the criminal investigation, Hoffman had pointed to Miller's photograph but stated that she could not be certain that he was the robber.

Defendants have a due process right not to be subject to unreasonably suggestive identification procedures that create a "substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (citation and internal quotation marks omitted). However, demonstrating that an identification is "so unreliable that it violates due process to allow the jury to hear it" is a "high standard," *Johnson v. McCaughtry*, 92 F.3d 585, 597 (7th Cir. 1996), and we have repeatedly held that "[a] defendant's mere presence at the defense table [at the time of identification] is not enough to establish a violation of due process." *United States v. Recendiz*, 557 F.3d 511, 525 (7th Cir. 2009); *see also Rodriguez v. Peters*, 63 F.3d 546, 556 (7th Cir. 1995). In addition, the fact

that a witness could not positively identify the defendant in a pre-trial identification procedure does not automatically render that witness's subsequent in-court identification inadmissible. *See Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014) ("The fact that Johnson was not able to select [defendant]'s photo may tend to discredit Johnson's [in-court identification], but this is not our concern, for examining the accuracy of the identification falls within the exclusive province of the jury." (citation and internal quotation marks omitted)).

Miller cites our decision in *Cossel v. Miller*, 229 F.3d 649 (7th Cir. 2000), in which we concluded that trial counsel was ineffective for failing to object to an in-court identification, but *Cossel* is readily distinguishable. Most importantly, in *Cossel*, there were two pre-trial identification procedures—a line-up and a single-photo show-up—which the government conceded were unnecessarily suggestive, and which therefore tainted the subsequent in-court identification. *Id.* at 655. Crucially, there is no allegation of any prior impermissibly suggestive identification procedure here. There were also further indicia of unreliability in *Cossel*. The Supreme Court has listed several factors to consider in determining the reliability of a challenged identification, including the witness's opportunity to observe the perpetrator at the time of the crime; the witness's degree of attention; the accuracy of the witness's prior description; the witness's level of certainty at the time of the identification; and the length of time that has elapsed between the crime and the identification.[4] *Biggers*,

---

[4] It is worth noting that these factors—while relevant to the reliability of any identification—are typically cited when evaluating whether an identification made during an impermissibly suggestive identification procedure was nonetheless reliable under the circumstances. *See Lee*, 750 F.3d

409 U.S. at 199–200. In *Cossel*, although the eyewitness had ten seconds to view the assailant by moonlight and street-light, the defendant did not match the pre-identification description that the witness provided. 229 F.3d at 655–56. In addition, far more time elapsed between the crime and the identifications at issue in *Cossel* than in the instant case: here, eighteen months passed between the robbery and Hoffman's in-court identification, while in *Cossel*, three years passed before the first positive (and concededly suggestive) out-of-court identification and six years elapsed between the crime and the challenged in-court identification. *Id.* at 656.

It is true that Hoffman's in-court identification also lacks certain indicia of reliability. While Hoffman—who was standing at the teller counter during the bank robbery—had an unobstructed view of the robber at close range, the record suggests that she did not realize a robbery was being committed and that she likely paid little attention to the robber's appearance. Further, although Hoffman appears to have displayed some certainty with respect to her in-court identification, at the time she viewed the photo array, she expressed doubt as to her ability to identify the robber. Yet we have acknowledged that in-court identifications are often "much less reliable than fair line-ups and photo arrays" but have nevertheless concluded that "[t]his does not necessarily

---

at 692 ("The Supreme Court set forth several factors for courts to use to determine whether an *unduly suggestive* identification procedure was still to be considered reliable … ." (emphasis added)); *see also Cossel*, 229 F.3d at 655 ("In determining whether an identification is reliable despite suggestive pre-trial identification procedures, courts look to the '*Biggers* factors' … ."). Because we do not believe that the identification procedure at issue here was unduly suggestive, these factors have limited bearing on our analysis.

mean … that a witness should not be allowed to take the stand and make such an identification." *Johnson*, 92 F.3d at 597. Suppression of an identification is an extreme and often inappropriate remedy; rather, where defense counsel has "more than adequate opportunity to cross examine [the witness] and to make clear to the jury that [the witness] was unable to pick [the defendant] out of the photo array," due process will generally be deemed satisfied. *Id.* Here, Tavitas thoroughly cross-examined Hoffman in an attempt to attack the reliability of her identification. He pointed out that she had only a brief opportunity to observe the robber, and further noted that she had failed to pick Miller out of a photo array shortly after the robbery. This exchange provided the jury with sufficient information with which to evaluate the reliability of Hoffman's identification. We therefore conclude that Tavitas's decision not to object to that identification did not fall below an objective standard of reasonable attorney performance.

Miller next argues that Tavitas was ineffective as a result of his decision not to undermine Agent Peasley's credibility by cross-examining him as to the statements Tauber made upon viewing the photo array. According to Miller, Agent Peasley's affidavit improperly represented that Tauber had positively identified Miller as the bank robber. He reasons that if Tavitas had exposed Agent Peasley's willingness to mischaracterize a witness's statement, the jury would not have given credence to Agent Peasley's report of Miller's confession. Miller cannot prevail on this claim for two reasons.

First, we do not believe that Agent Peasley misrepresented Tauber's statements in his affidavit. The affidavit explains

that Tauber "thought the [robber] reminded her of a courier who comes into the bank," and also "thought [that Miller's] photo reminded her of the courier." While this language certainly permits an inference that Miller looked like the robber, it does not mischaracterize Tauber's limited observation that Miller resembled the courier. Therefore, any attempt Tavitas might have made to use the affidavit against Agent Peasley would likely have had little, if any, effect on a jury. Second, there is a legitimate strategic explanation for Tavitas's decision not to cross-examine Agent Peasley on this issue. Because Tauber died prior to trial, no evidence was introduced concerning her comments about the photo array and the fact that both the robber and Miller's photo reminded her of the courier. Introducing that information in order to impeach Agent Peasley would have revealed to the jury otherwise unavailable information that might have encouraged jurors to draw the damaging inference that Miller was in fact the perpetrator because both he and the robber reminded Tauber of the courier. Because Tavitas's decision not to run that risk can be deemed sound trial strategy, it does not constitute deficient performance.

Miller's final claim of ineffectiveness relates to Tavitas's failure to correct Agent Peasley's testimony that Miller's bank account had been overdrawn by some $730 on the morning of the robbery. Tavitas offered no explanation for this oversight. The district court assumed without deciding that Tavitas's error did fall below an objective standard of reasonableness, thereby satisfying the performance prong of *Strickland*. *See* 466 U.S. at 687–88. The government challenges this conclusion, claiming that such a minor error, in light of otherwise satisfactory representation, cannot amount to constitutionally insufficient performance. *Cf. Groves v. United*

*States*, 755 F.3d 588, 593 (7th Cir. 2014) ("Even if counsel erred for failing to object to the [presentence report]'s characterization of [defendant]'s 1995 burglary conviction, we do not examine this error in isolation, but instead analyze counsel's performance as a whole."). However, we need not determine whether Tavitas's performance was deficient in this respect because, regardless of whether the first prong of *Strickland* has been satisfied, Tavitas's oversight did not prejudice Miller. As discussed above, in light of all of the remaining evidence presented at trial, Miller has not demonstrated a "reasonable probability" that, but for Tavitas's failure to correct Agent Peasley's overstatement, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Tavitas therefore cannot succeed on his claim of ineffective assistance of counsel.[5]

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Miller's motion for a new trial.

---

[5] We note that because Miller brought his ineffective assistance of counsel claim on direct appeal, he will be barred from collaterally attacking his conviction on these same grounds. *See Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005) ("[A] defendant who chooses to make an ineffective-assistance argument on direct appeal cannot present it again on collateral review.").